# 14-1261(L)

## 14-1638 (XAP)

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**JOHN DOE, by and through his Parent, JANE DOE**
*Plaintiffs - Appellees - Cross-Appellants*

**V.**

**EAST LYME BOARD OF EDUCATION**
*Defendant - Appellant - Cross-Appellee*

**and**

**DEPARTMENT OF EDUCATION, CONNECTICUT STATE**
*Defendant*

*ON APPEAL FROM THE FINAL JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT,
THE HONORABLE JANET B. ARTERTON, ON MARCH 17, 2014,
AS AMENDED ON APRIL 4, 2014, 3:11-cv-291 (JBA)*

**BRIEF OF DEFENDANT - APPELLANT - CROSS-APPELLEE
EAST LYME BOARD OF EDUCATION**

**Sheldon D. Myers**
**Kainen, Escalera & McHale, P.C.**
**21 Oak Street, Suite 601**
**Hartford, CT  06106**
**Tel.: 860-493-0870; Fax: 860-493-0871**
smyers@kemlaw.com
**Attorneys for East Lyme Board of Ed.**

**July 29, 2014**

# TABLE OF CONTENTS

Table of Authorities ............................................................................ ii

Statement of Subject-Matter & Appellate Jurisdiction ............................................. 1

Statement of the Issues ............................................................................ 1

Statement of the Case ............................................................................ 2

Statement of Facts ............................................................................ 3

Summary of the Argument ............................................................................ 10

Argument ............................................................................ 11

    1.    The Student's "Stay Put" Rights Were Not Violated........................ 12

    2.    The Student's "Stay Put" Rights Were Not Triggered
        On June 17, 2009 ............................................................ 16

    3.    The Does Are Not Entitled To Relief For Any Purported "Stay Put"
        Violation For The 2008-09 And 2009-10 School Years ................... 20

    4.    The District Court Erred In Calculating The Amount Of
        Reimbursement Awarded To The Does For The
        Alleged "Stay Put" Violation............................................ 22

    5.    The Board Did Not Violate The Student's Right To A Free
        Appropriate Public Education In The 2010-11 School Year ............. 25

Conclusion ............................................................................ 30

Certificate of Compliance ............................................................................ 31

Certificate of Service ............................................................................ 31

# TABLE OF AUTHORITIES

CASES:

A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Central Sch. Dist.,
553 F.3d 165 (2d Cir. 2009) ................................................................. 29

A.E. v. Westport Bd. of Educ., 463 F.Supp.2d 208 (D.Conn. 2006),
aff'd, 251 Fed. Appx. 685 (2d Cir. 2007) ............................................ 8

A.S. ex rel. P.B.S v. Bd. of Educ. for Town of W. Hartford,
245 F.Supp.2d 417 (D. Conn. 2001) .................................................. 17

A.S. v. Bd. of Educ. for Town of W. Hartford,
47 Fed. Appx. 615 (2d Cir. 2002) ................................................. 16-17

Bd. of Educ. v. Rowley, 458 U.S.176 (1982) .................................... 12

Carmel Cent. Sch. Dist. v. V.P., 373 F.Supp.2d 402 (S.D.N.Y. 2005),
aff'd on other grounds, 192 Fed. Appx. 62 (2d Cir. 2006) ................. 21

Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186 (2d Cir. 2005) .... 11-12

D.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503 (2d Cir. 2006),
amended on other grounds, 480 F.3d 118 (2d Cir. 2007) ..................... 3

Doe v. East Lyme Bd. of Educ., 2012 U.S. Dist. LEXIS 135486
(D. Conn. Sept. 21, 2012)...................................................................... 2

Florence County Sch. Dist. v. Carter, 510 U.S. 7 (1993)................... 13

Grim v. Rhineback Central Sch. Dist.,
2003 U.S. App. LEXIS 27934 (2d Cir. 2003)..................................... 28

J.G. v. Briarcliff Manor Union Free Sch. Dist.,
682 F.Supp.2d 387 (S.D.N.Y. 2010).................................................. 26

J.P.E.H. v. Hooksett Sch. Dist.,
2008 U.S. Dist. LEXIS 89377 (D.N.H. Oct. 22, 2008)....................... 27

K.D. ex rel. C.L. v. Dept. of Educ., Hawaii, 665 F.3d 1110 (9th Cir. 2011)........... 19

L.G. v. Wissahickon Sch. Dist., 2011 U.S. Dist. LEXIS 476
(E.D. Pa. Jan. 4, 2011)..................................................................25-26

M.C. v. Voluntown Bd. of Educ., 226 F.3d 60 (2d Cir. 2000) .........22-23

Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.,
86 F.Supp.2d 354 (S.D.N.Y. 2000), aff'd, 297 F.3d 195 (2d Cir. 2002).......... 12, 15

Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.,
288 F.3d 478 (2d. Cir. 2002) ................................................................ 23

Sch. Comm. of Town of Burlington, Mass. V. Dept. of Educ. of Mass,
471 U.S. 359 (1985) ................................................................ 12, 20

Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119 (2d Cir. 1998) .......... 22-23

Weaver v. Millbrook Cent. Sch. Dist., 812 F.Supp.2d 514 (S.D.N.Y. 2011)......... 18

Zvi D. by Shirley D. v. Ambach, 694 F.2d 904 (2d Cir. 1982) .................. 13-15, 19


STATUTES:

20 U.S.C. §§ 1400-1482 .................................................................. 1

20 U.S.C. § 1401(3) ....................................................................... 3

20 U.S.C. § 1401(14) ..................................................................... 3

20 U.S.C. § 1412(a)(10)(C)(i) ........................................................ 21

20 U.S.C. § 1412(a)(10)(C)(ii) ......................................................... 9

20 U.S.C. § 1414(a)(1)(A)-(B) ......................................................... 3

20 U.S.C. § 1414(d)(1)-(3) .............................................................. 3

20 U.S.C. § 1414(d)(1)(A) .............................................................. 3

20 U.S.C. § 1415(e)(3) .................................................................. 21

20 U.S.C. § 1415(f) ....................................................................... 6

20 U.S.C. § 1415(f)(3)(E)(ii) .......................................................... 28

20 U.S.C. § 1415(i)(2) ................................................................... 8

20 U.S.C. § 1415(i)(3)(A) ............................................................... 1

20 U.S.C. § 1415(j)................................................................ 12, 17-19

20 U.S.C. § 1415(l)....................................................................... 23

28 U.S.C. § 1291 ......................................................................... 1

28 U.S.C. § 1331 .......................................................................... 1

Conn. Gen. Stat. § 10-76h(d)(4)....................................................... 8

REGULATIONS:

34 C.F.R. § 300.131(a) ........................................................................ 27

34 C.F.R. § 300.137(a) ........................................................................ 21

34 C.F.R. § 300.507 .............................................................................. 6

Conn. Agencies Regs. § 10-76a-1(14) ................................................. 3

Conn. Agencies Regs. § 10-76d-10 ...................................................... 3

Conn. Agencies Regs. § 10-76d-11 ...................................................... 3

Conn. Agencies Regs. § 10-76h-3 .................................................... 6, 18

Conn. Agencies Regs. § 10-76h-17(a) ............................................ 12, 18

RULES:

Fed. R. App. P. 28.1(c)(1) ..................................................................... 2

## STATEMENT OF SUBJECT-MATTER & APPELLATE JURISDICTION

Court") had subject matter jurisdiction, under 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(3)(A), to adjudicate the underlying action brought by John Doe ("Student"), by and through his parent, Jane Doe ("Parent") (collectively "the Does"), pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482. The District Court entered a final judgment on March 17, 2014, as amended on April 4, 2014. The East Lyme Board of Education ("Board") filed a timely notice of appeal on April 16, 2014. This Court has appellate jurisdiction under 28 U.S.C. § 1291 to review the District Court's final judgment.

## STATEMENT OF THE ISSUES

1. Whether the District Court erred in granting the Does' motion for summary judgment, in part, finding that the Board violated the Student's "stay put" rights.

2. Whether the District Court erred in granting the Does' motion for summary judgment, in part, finding that the Board violated the Student's "stay put" rights as of June 17, 2009 -- the date the District Court concluded an impasse had been reached regarding the proposed Individualized Education Program ("IEP") for the Student for the 2009-10 school year.

3.    Whether the District Court erred in awarding relief for a "stay put" violation for the 2008-09 and 2009-10 school years when the Parent had not initiated due process proceedings until September 30, 2010.

4.    Whether the District Court erred in calculating the amount of reimbursement awarded to the Does for the alleged "stay put" violation.

5.    Whether the District Court erred in granting the Does' motion for summary judgment, in part, finding that the Board violated the Student's right to a free appropriate public education ("FAPE") in the 2010-11 school year by allegedly failing to provide an IEP for that year.

## STATEMENT OF THE CASE

This case is on appeal[1] from: (1) a decision issued by The Honorable Janet B. Arterton on September 21, 2012, in which she found that: (a) the Board violated the Does' "stay put" rights as of June 17, 2009; and that (b) the Board violated the Student's right to a FAPE in the 2010-11 school year (see Doe v. East Lyme Bd. of Educ., 2012 U.S. Dist. LEXIS 135486 (D. Conn. Sept. 21, 2012)); and from (2) Judge Arterton's unreported decision on March 17, 2014, in which she ordered the Board to reimburse the Does in the amount of $97,445.00 for the "stay put" violation. See Appendix ("A") at A109-124; A140-149.

---

[1] The Does have also filed a cross-appeal. See Docket No. 14-1638. Per Fed. R. App. P. 28.1(c)(1), this brief shall only address the Board's issues on appeal.

2

## STATEMENT OF FACTS

During the time relevant to this action, the Student was identified as a "child with a disability" eligible for special education related services pursuant to the IDEA under the category of Autism. (A45). He attended public school in East Lyme, Connecticut from preschool through the middle of first grade, and then Hope Academy ("Hope") -- a private special education facility -- at the Board's expense through the end of second grade in June of 2008.  (A45-46).

In June 2008, the Parent participated in a Planning and Placement Team Meeting ("PPT") for purposes of discussing the Student's IEP for the 2008-2009 school year. [2] (A46).  At this PPT, the Board proposed to continue the Student's placement at Hope for third grade. (Id.).  In response, the Parent did not ask for

---

[2] When a student is determined to be a "child with a disability" within the meaning of the IDEA and corresponding Connecticut law, an "IEP Team," consisting of the child's parents and representatives of the child's local education agency ("LEA") -- in this case East Lyme Public Schools – meets to develop an IEP. See 20 U.S.C. §§ 1401(3), 1414(a)(1)(A)-(B), 1414(d)(1)-(3). An IEP is a "written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" D.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503, 507-08 (2d Cir. 2006) (citation omitted), amended on other grounds, 480 F.3d 138 (2d. Cir. 2007); see also 20 U.S.C. §§ 1401(14), 1414(d)(1)(A). In Connecticut, the IEP Team is the "PPT." See Conn. Agencies. Regs. §§ 10-76a-1(14), 10-76d-10, 10-76d-11.

other placements, request any revisions to the IEP or request due process to challenge the IEP at that time. (A189-190).[3]

On August 18, 2008, the Parent verbally advised Stephen Buck, then Director of Special Education for East Lyme, that she was enrolling the Student at Solomon Schechter Academy ("SSA"), a private, religious school in New London, CT, at her own expense. (A45-47; A185). The Parent further informed Mr. Buck that she wanted to keep the Student's placement at Hope on hold in case SSA did not work out, and therefore, the Board placed the Student on leave from Hope and continued to pay his tuition there. (A46-47; A186; A193). Thereafter, the Parent unilaterally enrolled the Student at SSA for third grade in the Fall of 2008, without having provided the Board with any prior written notice. (A47, A187-188).

On December 18, 2008, another PPT was held, at which time the Parent indicated she intended to keep the Student at SSA and to pay for his tuition. (A47; A164). Though the Board did not agree to the Student's placement at SSA, the Board agreed to pay for a total of nine hours per week of special education and related services through the end of the 2008-09 school year, consisting of 2.5 hours/week of speech-language therapy; 5 hours/week of reading instruction using

---

[3] The Administrative Record, dated May 10, 2011, was filed under seal in the District Court. Accordingly, to the extent that relevant portions of the Administrative Record are submitted herewith, any identifying information pertaining to the Student or the Parent has been redacted.

the Orton-Gillingham method; and 1.5 hours of occupational/physical therapy. (A47-48; A163). This decision was memorialized in an IEP dated December 18, 2008 (A150-163), which was further modified on February 10, 2009 to add 0.5 more hours of speech-language therapy per week through the end of the 2008-09 school year. (A48; A166-169).

On June 17, 2009, another PPT was convened to review the Student's IEP for the 2009-10 school year. (A49). At this PPT, Dr. Corrine Berglund (who had succeeded Mr. Buck as East Lyme's Director of Special Education) informed the Parent that if she elected to continue the Student's enrollment at SSA for the 2009-2010 school year, then the Board would no longer be responsible for the Student's education because SSA was located in New London. (A45; A50; A172-175). The Parent rejected the Board's proposed 2009-10 IEP, advised the Board of the related services she planned to secure and of her expectation that these services would be paid at public expense, and re-enrolled the Student at SSA for the 2009-10 school year. (A45; A51; A176-179). On July 14, 2009, Dr. Berglund informed the Parent that the Board would "not be providing services other than those delineated in the [proposed 2009-10 IEP] . . ." and notified the Parent of her rights to pursue due process. [4] (A45; A180). The Parent did not initiate due process at that time.

---

[4] Under the IDEA and corresponding Connecticut law, a parent may seek a due process hearing before a state administrative agency, which in Connecticut is the Connecticut State Department of Education ("CSDE"), when a parent and a school

On July 13, 2010 (following the conclusion of the 2009-10 school year), Brian Reas, then East Lyme's Assistant Superintendent for Special Education and Pupil Personnel, notified the Parent that: (a) "[the Student] [was] not currently enrolled in East Lyme Public Schools and therefore does not have a current [IEP]."; and that (b) "[i]f [the Student] were to be registered in East Lyme Public Schools, [the Student] would have a program provided to him per the decision of the [PPT]."  (A181). Thereafter, the Parent never requested an IEP for the 2010-11 school year.  Rather, on August 15, 2010, the Parent notified the Board of her intent to continue to enroll the Student at SSA and to procure related services at the public's expense for the 2010-11 school year. (A182). Indeed, at no time relevant to this action did the Parent ever intend to return the Student to East Lyme. (A192).

On September 30, 2010, the Does instituted due process proceedings against the Board. (A183).  On January 10, 2011, Attorney Elizabeth Borino of the CSDE ("Hearing Officer") issued a twenty page, single-spaced decision setting forth detailed findings of fact and conclusions of law (A43-63), overwhelmingly rejecting the Does' claims by determining, in relevant part, that: (1) the Board had offered the Student a FAPE for the 2008-2009 and 2009-10 school years; (2) the Parent's unilateral placement of the Student at SSA beginning in the 2008-09

---

district disagree (among other things) about what constitutes a FAPE for a child. See 20 U.S.C. § 1415(f); 34 C.F.R. § 300.507; Conn. Agencies. Regs. § 10-76h-3.

school year was not an appropriate educational placement for purposes of seeking reimbursement from the Board; (3) the Board was not financially responsible for the Student's tuition at SSA nor was it financially responsible for the cost of special education and related services while the Student was enrolled at SSA; (4) the Student was parentally placed at SSA, and therefore, the Board was not required to develop an IEP for the 2010-11 school year; and that (5) to the extent any procedural violations occurred, they were not sufficiently significant to result in a denial of the Student's FAPE. (A47; A56; A58; A60-62).

Further, while the Does had initially requested that the Hearing Officer determine that the December 18, 2008 IEP constituted the Student's "stay put" placement (A43), the Hearing Officer ultimately found that issue moot because the Parent neither submitted evidence regarding this claim during the hearing nor argued this issue in her post-hearing brief. (A54). Finally, the Hearing Officer found in favor of the Does on only one of the thirteen issues they submitted, namely, that the Board did not conduct a PPT meeting and develop an IEP for the 2010-2011 school year when the Student was in a private parental placement. (A54). However, the only relief ordered by the Hearing Officer was to direct the Board to convene a PPT meeting for purposes of conducting an annual review of the Student and to review possible alternative placements for the Student. (A62).

On February 24, 2011, the Does appealed the Hearing Officer's decision by commencing the underlying action in District Court.[5] (A38-39). Thereafter, on January 17, 2012, the parties filed cross-motions for summary judgment on the administrative record.[6]

On August 14, 2012, Magistrate Joan Margolis recommended that the Parent's motion for summary judgment be granted, in limited part, finding that the Board violated the Student's right to a FAPE in the 2010-11 school year by allegedly failing to provide an IEP for that year. (A107-108). Nevertheless, the Magistrate further recommended that no relief be awarded to the Parent for such violation because the Parent's decision to enroll the Student at SSA was not an appropriate educational placement. (A98-101; A107, n.53).

In addition, even though the Does had not sought "stay put" relief in the District Court complaint (A107, n.54), the Magistrate, *sua sponte*, recommended that the Board be ordered to reimburse the Does for the costs of related services

---

[5] Any party dissatisfied with the due process decision may bring a civil action in federal or state court. See 20 U.S.C. § 1415(i)(2); Conn. Gen. Stat. § 10-76h(d)(4).

[6] When a District Court decides a summary judgment motion on an appeal under the IDEA, "[the] court's inquiry is not directed to discerning whether there are disputed issues of fact, but rather whether the administrative record, together with any additional evidence [permitted], establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." A.E. v. Westport Bd. of Educ., 463 F.Supp.2d 208, 215 (D. Conn. 2006) (citation omitted), aff'd, 251 Fed. Appx. 685 (2d Cir. 2007).

due to a violation of the Does' "stay put" right[7] as of June 17, 2009 -- the date

when the Magistrate concluded an impasse had been reached regarding the

proposed IEP for the 2009-10 school year. (A88-90).  As a result, the Magistrate

further recommended that the Board be held responsible for payment of the cost of

special education and related services for the 2008-2009 and 2009-10 school years

due to the "stay put" violation. (A90; A106-108).  Thereafter, Judge Arterton

issued her September 12, 2012 Ruling, adopting the Magistrate's recommendations

with a single modification to reflect the Parent's entitlement to reimbursement for

services until the final disposition of the District Court case. (A109-114; A124).

On November 27, 2012, Magistrate Margolis further recommended that

judgment be issued in the amount of $70,925.00 for the Does as reimbursement for

the "stay put" violation. (A138-139). Thereafter, Judge Arterton issued her March

17, 2014 Ruling, adopting the Magistrate's recommendation with a single

modification to reflect the additional time that had passed in the case. (A148-149).

Accordingly, Judge Arterton ordered the Board to reimburse the Does in the

amount of $97,445.00 for the purported continued "stay put" violation for the

---

[7] When parents and a school district disagree about what constitutes a FAPE for a
child, the parents may enroll their child in a private school without the district's
consent and at their own expense, and if a Hearing Officer (or court) ultimately
finds that the proposed IEP does not provide a FAPE, the district may be ordered
to reimburse the parents for the cost of the private program, including special
education and related services. 20 U.S.C. § 1412(a)(10)(C)(ii).

entire 2012-13 school year, and from September 2013 through March 17, 2014 when final judgment entered.[8] (A3; A148-149).

## SUMMARY OF THE ARGUMENT

Viewing the administrative record as a whole and giving substantial deference to the Hearing Officer, the Does failed to establish that the Board violated the Student's "stay put" rights. Further, the District Court erred in concluding that the Board's purported violation of the Student's "stay put" rights was triggered as of June 17, 2009. Rather, the Does are not entitled to relief for any "stay put" violation for the 2008-09 and 2009-10 school years because the Parent had not initiated due process proceedings until September 30, 2010.

Further, the District Court erred in calculating the amount of reimbursement awarded to the Does for the alleged "stay put" violation, in that: (a) reimbursement is barred for the 2009-10 and 2010-11 school years because the Student was parentally placed at SSA and the Board provided a FAPE for these years; (b) reimbursement is not available for the 2011-12, 2012-13 or 2013-14 school years due to the Does' failure to exhaust administrative remedies; (c) reimbursement is barred for any time after the District Court's September 21, 2012 Ruling, which disposed of the dispute regarding the 2009-10 IEP in the Board's favor by

---

[8] An amended judgment, unchanged in relevant part, entered on April 4, 2014. (A4).

concluding that the Student was offered a FAPE for the 2009-10 school year; and (d) the Does are not entitled to payments for services not rendered or provided in excess of the 2008-09 IEP.  Finally, the District Court erred in holding that the Board violated the Student's right to a FAPE in the 2010-11 school year, since the Board was not obligated to provide any IEP, and in any event, the Student was not harmed.  Accordingly, the District Court's Rulings should be reversed, in part, with instructions to enter judgment in favor of the Board by holding that there was no "stay put" violation and no violation of a FAPE for the 2010-11 school year.

## ARGUMENT

"[An appellate court] review[s] *de novo* the District Court's award of summary judgment [in an IDEA case]." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005).  Further, "[w]hether the District Court correctly applied the IDEA's statutory and regulatory provisions to the facts of a particular case is a mixed question of law and fact, which [is] also review[ed] *de novo*. . . . **giv[ing] due weight to [the administrative] proceedings** . . .". Id. at 191-192 (emphasis added) (internal quotation marks and citations omitted).  In this latter regard, courts must afford substantial deference to the factual and educational determinations of the Hearing Officer and "cannot substitute [their] own notions of sound educational policy for those of the school authorities which they review, mindful that the judiciary 'lacks the specialized knowledge and experience

11

necessary to resolve persistent and difficult questions of educational policy.'" Id.
(citing Bd. of Educ. v. Rowley, 458 U.S. 176, 206, 208 (1982)).

    1.  The Student's "Stay-Put" Rights Were Not Violated

        Under 20 U.S.C. § 1415(j) and Conn. Agencies. Regs. § 10-76h-17(a), a
"stay put" violation occurs if the child does not remain "in the then-current
educational placement" during the proceedings challenging the child's IEP and the
administrative Hearing Officer (or the court) determines that the parent's unilateral
placement was appropriate.   The prevailing purpose behind the "stay put"
provision is to prevent "school officials from removing a child from the regular
public school class room over the parents' objection pending completion of the
review proceedings." Sch. Comm. of Town of Burlington, Mass. v. Dept. of Educ.
of Mass., 471 U.S. 359, 373 (1985) ("Burlington"). However, the Supreme Court
has warned "that parents who unilaterally change their child's placement during
the pendency of review proceedings, without the consent of state or local school
officials, do so at their own financial risk." Burlington, supra, 471 U.S. at 373-74;
Accord Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 86 F. Supp. 2d 354,
357 (S.D.N.Y. 2000), affd, 297 F.3d 195 (2d Cir. 2002) (citing Burlington).  Such
action is at the parents' own risk because they would be "entitled to reimbursement
*only* if a federal court concludes that both the public placement violated IDEA and

that the private school placement was proper under the Act." <u>Florence County Sch. Dist. v. Carter</u>, 510 U.S. 7, 15 (1993) (emphasis in original).

The Does are not entitled to relief for an alleged "stay put" violation in this case because no "stay put" rights to the parental placement are obtained until (and unless) a parent succeeds at due process, which did not occur here. In this regard, the Hearing Officer specifically and unequivocally found that the Student was <u>parentally placed</u>:

> The Parent enrolled the Student at SSA for the 2008-2009 school year. The Parent did not provide prior written notice to the Board that she was enrolling the Student at SSA; nor did she inform the Board she expected such placement to be at public expense prior thereto. **When the Parent so enrolled the Student at SSA, this constituted parental placement in a private, religious school.**

(A47) (emphasis added). This factual finding is precisely the type which should be afforded substantial deference, but the District Court afforded none. Rather, the District Court ignored that it was the Parent who changed the Student's placement prior to initiating due process, and therefore, the Parent's unilateral placement could not become the "stay put" placement, until and unless a decision on the merits in the Parent's favor was rendered which never happened here.

A review of the Second Circuit's decision in <u>Zvi D. by Shirley D. v. Ambach</u>, 694 F.2d 904 (2d Cir. 1982), is instructive. In <u>Zvi D.</u>, while awaiting administrative review of the child's placement to which the parent objected, the parent enrolled the

13

child in a private school program for the 1978-1979 school year. Id. at 907. The Board agreed to fund the student's tuition for one-year only with the stipulation that an appropriate public placement was contemplated for the following year. Id. After the Board recommended a public placement in May 1979 for the following year, the parent again rejected the proposal and continued to send the child to the private school for the 1979-80 school year. Id.  In July 1980, a Hearing Officer determined that the public placement was appropriate. Id.  However, due to an unrelated procedural violation, the Hearing Officer determined that the Board was responsible for the student's tuition for the 1979-80 school year. Id. The student was again reevaluated at the conclusion of the 1979-80 school year and the Board again recommended a public placement, which the parent rejected for a third time. Id.

Because the Hearing Officer had determined that the public placement was appropriate and that the parent's private placement was not appropriate, and because neither the one-year stipulated agreement to fund the tuition nor the Hearing Officer's decision constituted a public agency placement of the child, the Second Circuit concluded that the parent failed to establish that the private school was the child's "current educational placement" within the meaning of the IDEA. Id. at 908.  As such, the Second Circuit refused to hold the Board responsible for the child's tuition after the 1978-79 school year, reasoning that "the status quo

14

provision would [only] apply if the Board . . . had previously agreed to, or had been ordered to provide private school placement . . . [but the Board] had not so agreed or been ordered . . . [and] "[p]ayment and placement are two different matters." Id.

In this case, while the Board provided **payment** for related services the first year the Student attended SSA (2008-09), the Board never recommended "SSA plus related services" as an appropriate **placement**. Further, when the Parent enrolled the Student at SSA in 2008, she had not objected to the 2008-09 IEP which placed the Student at Hope. (A189-190). In fact, the Parent requested that the Board preserve the placement at Hope in case she decided to enroll the Student there. (A46-47; A186; A193). Finally, in June of 2009 when the Parent rejected the proposed 2009-10 IEP, she had already voluntarily moved the Student to SSA.

In this regard, how a student becomes enrolled at a private school is a critical factual question with respect to whether "stay put" rights are acquired. Where a parent has unilaterally placed the student, only when a Hearing Officer finds that the private placement is appropriate does the funding for that placement become the school district's financial responsibility pending the resolution of the litigation, or in other words, the student's "stay put" placement. See, e.g., Murphy, supra, 86 F. Supp. 2d at 359-60, 366-67. The Parent is not entitled to any "stay put" protections in this case because neither the Hearing Officer (nor the District Court) found in the Parent's favor on her claims as to the inappropriateness of the Board's

placement and the appropriateness of her placement at SSA. Rather, the Hearing Officer determined (and the District Court affirmed) that the Board offered the Student a FAPE for the 2008-09 and 2009-10 school years. (A62; A116-118; A121-123). Thus, because the Parent parentally placed the Student in her program and that placement was determined not to be appropriate, no "stay put" right arose.

The Parent cannot create a "stay put" placement by keeping the Student enrolled in the program she chose. To the contrary, since the Board never agreed to "SSA plus services" as the Student's "placement," the proposed 2009-10 IEP did not "change his placement." It defies logic to hold the Board responsible for a "stay put" violation with respect to a parental placement initiated and continued by the Parent herself. This would turn "stay put" on its head.

2. <u>The Student's "Stay-Put" Rights Were Not Triggered On June 17, 2009</u>

The District Court determined that the Student's "stay put" rights were triggered as of the June 17, 2009 PPT meeting -- the date the Parent rejected the Board's proposed 2009-2010 IEP and stated that it was "in violation of the Stay Put law." (A89-90; A112-113; A171). The sole legal authority relied upon by the District Court to support this conclusion is contained in a footnote in a Summary Order issued by the Second Circuit in the matter of <u>A.S. v. Bd. of Educ. for Town of W. Hartford</u>, 47 Fed. Appx. 615 (2d Cir. 2002). (A113). In this footnote, the Second Circuit noted that "[u]nder the IDEA, a 'stay put' is a procedural right that

16

is activated as soon as the PPT reaches an impasse . . .". <u>A.S.</u>, <u>supra</u>, 47 Fed. Appx. at 616, n.2.  However, reliance on this footnote is entirely misplaced.

To begin with, the issue in the <u>A.S.</u> case did not even involve a "stay put" dispute. Rather, "the gravamen of the [parent's] appeal [in <u>A.S.</u>] [was] that the Hearing Officer improperly concluded that the Board's recommended placement was reasonably calculated to enable [the student] to receive educational benefits." <u>A.S. ex rel. P.B.S. v. Board of Educ. of Town of W. Hartford</u>, 245 F. Supp.2d 417, 427 (D. Conn. 2001). Indeed, the parties had agreed to implement a "stay put" at a PPT meeting, well before due process was requested. <u>Id</u>. at 423-24.  Thus, whatever was indicated in this footnote about "stay put" rights is purely dicta.

Furthermore, the entirety of this footnote reads in full: "Under the IDEA, a 'stay put' is a procedural right that is activated as soon as the PPT reaches an impasse and is issued pursuant to 20 U.S.C. § 1415(j), which states:  during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the Parents otherwise agree, the child shall remain in the then-current educational placement of such child." <u>A.S.</u>, <u>supra</u>, 47 Fed. Appx. at 616, n.2.  Thus, when read in its entirety, this footnote is entirely consistent with the principle that "stay put" is triggered only at the time of the filing of the due process complaint (i.e., "during the pendency of any proceedings conducted . . ."). There is no entitlement to any "stay put" prior to that time.

The District Court's determination that the "stay put" procedural right applies as soon as the PPT reaches an impasse, or in other words, as soon as a parent utters the words "stay put," essentially overrules the IDEA's "stay put" provision, Connecticut special education regulations and prevailing case law.

In this regard, the IDEA unequivocally provides that the "stay put" provision applies once due process has been initiated. See 20 U.S.C. § 1415(j) ( . . . during the pendency of any proceedings conducted pursuant to this section, unless the State or [LEA] and the Parents otherwise agree, the child shall remain in the then-current educational placement of the child . . .") (emphasis added). Furthermore, the governing regulations in Connecticut, Conn. Agencies Regs., §10-76h-17(a), also clearly state that "stay put" is only triggered by the pendency of any administrative or judicial proceedings as set forth in Section 10-76h-3.[9] ("Unless the public agency and the parent agree otherwise, the child shall remain in his or her then-current educational placement during the pendency of any administrative or judicial proceedings . . .") (emphasis added).

Case law further reveals that the "stay put" provision is only triggered by the initiation of due process proceedings. For example, in Weaver v. Millbrook Cent. Sch. Dist., 812 F. Supp. 2d 514 (S.D.N.Y. 2011), the parents rejected the school district's proposed IEP and stated they intended to seek reimbursement for the

---

[9] Conn. Agencies Regs. § 10-76h-3 addresses the request for a hearing (i.e., the filing of a due process complaint).

18

student's parental placement as of August 21, 2007 but did not commence due process proceedings until February 28, 2008. Id. at 526-527. The court held that "[t]he plain language of [20 U.S.C. § 1415(j)]" contemplates that this "provision only applies 'during the pendency of any proceedings' and not . . . 'before such a proceeding has begun.'" Id. at 526. As such, the court held that the start of the due process proceedings triggered the "stay put" obligations and that the district was not liable for any payments prior to February 28, 2008. Id. at 527.

Similarly, relying on the Second Circuit's decision in Zvi D, supra, the Ninth Circuit held that because "[t]he stay put provision may only be invoked 'during the pendency of any proceedings' . . . it [did] not apply unless and until a request for a due process hearing is filed." K.D. ex rel. C.L. v. Dept. of Educ., Hawaii, 665 F.3d 1110, 1117 (9th Cir. 2011). In K.D. the plaintiff did not request a due process hearing until August 28, 2009. Id. As such, the court held "the stay put provision can have no effect on K.D.'s enrollment . . . during the 2007-08 school year or during the 2008-09 school year prior to August 28, 2009 -- during which no due process hearing was pending." Id.

As demonstrated above, the District Court erroneously declared that the Does were entitled to relief for the purported "stay put" violation beginning as of June 17, 2009, where it is undisputed that the Parent did not initiate due process until September 30, 2010. (A183). Simply put, "stay put" is not triggered until the

initiation of due process proceedings. To hold otherwise would essentially turn the

utterance of the words "stay put" into a legally binding phrase in direct

contravention of the regulations under the IDEA and corresponding state law.

### 3. The Does Are Not Entitled To Relief For Any Purported "Stay-Put" Violation For The 2008-09 And 2009-10 School Years

As stated above, the IDEA allows for an order of reimbursement by a

Hearing Officer or court only if there is a finding that a FAPE was not provided

prior to enrollment. See Argument, Section 1, above.  In this case, the Board and

the Does agreed to limit payment for the Student's related services through the

termination of the 2008-09 IEP at the end of 2008-09 school year. (A47-48; A163).

The Hearing Officer found (and the District Court affirmed) that the Board

provided the Student with a FAPE for the 2008-09 and 2009-10 school years.

(A62; A116-118; A121-123). The Hearing Officer further did not order any "stay

put" placement at the due process hearing because the Does never made an

argument or presented testimony on this issue. (A54). The District Court's decision

that the Student's "stay put" was violated from the 2009-10 school year and

beyond is, therefore, unavailing and contrary to prevailing law and the principles

of the IDEA's "stay put" provision.

Further, the District Court's retroactive order of reimbursement violates the

Supreme Court's holding in Burlington, supra, 471 U.S. at 374 that: "[i]f the courts

ultimately determine that the IEP proposed by the school officials was appropriate,

the Parents would be barred from obtaining reimbursement for any interim period in which their child's placement violated § 1415(e)(3)." Because the District Court's decision awarded reimbursement for the "interim period" of 2008-2009 and 2009-2010 (in which the District Court upheld the Hearing Officer's decision that the IEP was appropriate and the Student was provided with a FAPE), this decision cannot stand. See 20 U.S.C. § 1412(a)(10)(C)(i) (the IDEA does not require a school district "to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that [district] made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility."); 34 C.F.R. § 300.137(a) ("no parentally-placed private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school."). This is particularly true, where as here, the Parent at no time showed any interest in returning the Student to East Lyme schools nor presented any evidence to the Hearing Officer or the Court that she ever wavered from or considered an alternate school other than SSA. (A192). See Carmel Cent. Sch. Dist. v. V.P., 373 F.Supp.2d 402, 416 (S.D.N.Y.2005), aff'd on other grounds, 192 Fed. Appx. 62 (2d Cir. 2006) (denying reimbursement where parents "never had the slightest intention of allowing the child to be educated in the public school . . .").

21

4. The District Court Erred In Calculating The Amount Of Reimbursement
   Awarded To The Does For The Alleged "Stay-Put" Violation

While the Board maintains that the Does are not entitled to any reimbursement at all for any alleged "stay put" violation, should the Second Circuit deny the Board's appeal in this regard, the District Court erred in calculating the amount of reimbursement awarded to the Does in several respects.

To begin with, the District Court erred in finding that the Board was responsible for payment of the costs of related services allegedly agreed upon in the 2008-2009 IEP from the date the dispute over the 2009-2010 IEP arose until the final disposition of the District Court case. In this regard, reimbursement is barred for the 2009-10 and 2010-11 school years because the Student was parentally placed at SSA, and both the Hearing Officer and the District Court have determined that the Board's 2009-10 IEP provided a FAPE for these years and that the Parent's placement at SSA was not appropriate. (A62; A116-118; A121-123). As in this case, then, "[i]f the challenged IEP was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry [as to reimbursement for costs] is at an end." M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000) (citation omitted); Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 134 (2d Cir. 1998) (holding that because the challenged IEP was appropriate, the defendant school could not "be ordered to reimburse the Parents for expenses incurred as a result of their decision to remove their child from the . . . program.").

22

Further, the Board cannot be liable for reimbursement for the 2011-12, 2012-13 or 2013-14 school years because at no point during the underlying due process proceedings were these school years ever at issue. Since the Does have not exhausted their administrative remedies for these years at due process as required, reimbursement for any part of these school years is improper. See Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist., 288 F.3d 478, 483 (2d Cir. 2002) (citing 20 U.S.C. § 1415(l)). Indeed, no evidence was even provided regarding the services (if any) the Student received to give any basis upon which to award reimbursement for the period after the September 21, 2012 Ruling.[10]

Additionally, even assuming *arguendo* that the Board is responsible for payment for the services specified in the 2008-09 IEP, the District Court erred in calculating the amount awarded for the services provided by Janet Campbell for Orton-Gillingham tutoring. (A163). That is, while the 2008-09 IEP indicated that the Student was entitled to 5.0 hours per week of Orton-Gillingham tutoring (A163), the District Court ignored the actual evidence submitted by the Does which reflects that the Student did not, in fact, receive 5.0 hours of such tutoring per week, and instead only received sporadic services by Ms. Campbell. (A138;

---

[10] Alternatively, the Does are not entitled to any amount of reimbursement past the District Court's September 21, 2012 Ruling because that Ruling disposed of the dispute regarding the 2009-10 IEP in the Board's favor by finding that it provided the Student with a FAPE. See M.C., supra; Walczak, supra.

A194). Thus, the District Court should have only awarded the Does $26,588 as reimbursement for the actual tutoring through the September 21, 2012 Ruling.

Finally, the District Court erred in calculating the amount of reimbursement for the speech/language therapy services. That is, while the initial provision of 2.5 hours per week of speech/language therapy in the December 18, 2008 IEP was increased to 3.0 hours per week as of February 10, 2009, this increase was expressly limited to the end of the 2008-2009 school year. (A169). Thus, the temporary increase in the Student's speech/language services was to end prior to when the District Court held that the dispute arose. Accordingly, the District Court erred in using 3.0 hours instead of 2.5 hours per week in calculating reimbursement for speech/language services, and should have only awarded the Does $27,075 as reimbursement through the September 21, 2012 Ruling.

In sum, to allow the Does to recoup payments for services not rendered or provided in excess of those allocated in the purported "stay put" agreement is without reason. The Does should not be allowed to implement their own program, without ever seeking a "stay put" order and to later seek reimbursement for that program that was found by the Hearing Officer and the District Court to be inappropriate. This is especially true considering the Board offered (and the Hearing Officer and the District Court specifically found that the Student was offered) a FAPE for the 2009-10 school year.

24

5. **The Board Did Not Violate The Student's Right
   To A FAPE In The 2010-11 School Year**

The District Court erred in finding that the Board violated the Student's right to a FAPE in the 2010-11 school year by allegedly failing to provide an IEP for that year because the Student was parentally placed prior to the 2010-11 school year, and thus, it was not necessary for the Board to draft an IEP for the Student for that year. In this regard, the IDEA, itself, does not state that there is a continual obligation to develop IEPs where students have enrolled in a private school. Further, courts have held that a student who is parentally placed by the parents' withdrawal of the student from a public school in favor of a private school relieves the district of its responsibility of developing or revising an IEP on an annual basis.

For example, in <u>L.G. v. Wissahickon Sch. Dist.</u>, 2011 U.S. Dist. LEXIS 476, (E.D. Pa. Jan. 4, 2011) ("Wissahickon"), the district developed an IEP in April of 2004 which expired in April 2005. <u>Id</u>, 2011 U.S. Dist. LEXIS 476 at *35. The parents rejected the IEP and enrolled the student at a private school for the 2004-05 school year. <u>Id</u>. at *36. Subsequent to the 2004-05 school year, the parents initiated due process hearings seeking reimbursement for their placement for the 2004-05 school year and prospective payment for the 2005-06 school year for the district's failure to develop an IEP for that year. <u>Id</u>. at *8. Upon review, the court held that the district did not violate IDEA's procedural requirements by allowing the 2004 IEP to expire and not drafting an IEP for the 2005-06 school year because the 2004

IEP constituted an offer of FAPE. Id. at \*36.  Thus, as a result of the parents'
rejection of the school district's offer of FAPE and their unilateral enrollment in
private school, the district did not have an obligation to develop an IEP for the
2005-06 year. Id.  Accord J.G. v. Briarcliff Manor Union Free Sch. Dist., 682
F.Supp.2d 387, 397 (S.D.N.Y. 2010) (holding that "[g]iven . . . the parents'
intention of enrolling [the student] at [another school] became even more clear, it
was reasonable for [the Board] not to hold another IEP meeting.").

The instant case is nearly identical to Wissahickon. The Board developed an
IEP that offered FAPE for the 2009-10 school year. The Parent rejected the IEP
and instead chose to enroll the Student in SSA in New London. In fact, the Parent
never even requested that the Board formulate an IEP for the 2010-11 school year.
Similar to the decision in Wissahickon, then, the Board had no obligation to
develop an IEP after the Parent rejected the Board's offer of a FAPE.

The Board was exceedingly cooperative with the Parent, going well beyond
what was legally required by paying for the Student's enrollment at Hope, even
after the Parent's unilateral transfer of the Student to SSA, and continuing to
provide related services to the Student until the end of the 2008-09 school year.
The Board then proposed an in-district placement for 2009-10, giving the Parent
options of two different schools and related services (to be provided by school
personnel), as well as providing for direct special education to the Student. The

Parent simply had no intention of returning the Student to East Lyme schools, even if a subsequent IEP was developed for the 2010-11 school year.  As a result, any obligation to evaluate the Student's need for IDEA services through an IEP passed from the Board to the school district in which his private school was located -- New London. See 34 CFR § 300.131(a) (stating that "each [school district] must locate, identify, and evaluate all children with disabilities who are enrolled by their parents in private, including religious, elementary schools and secondary schools located in the school district . . .") (emphasis added); J.P.E.H. v. Hooksett Sch. Dist., 2008 U.S. Dist. LEXIS 89377, *6 (D.N.H. Oct. 22, 2008) (enrollment outside of district, coupled with stated intention not to return student to the district, amounted to a change of circumstances such that need for services passed to the district in which the private school was located).

The Parent did not initiate due process until after the 2010-11 school year had begun and the Student was already enrolled and attending classes at SSA. The Parent had pre-determined the Student's placement, to which the Board did not agree and the Parent had no intention of returning him to the Board's program (which provided the Student with a FAPE) following the PPT of June 17, 2009. Therefore, even assuming it was a procedural error for the Board not to draft an IEP for the 2010-11 school year, such omission neither impeded the Student's right to a FAPE nor caused the deprivation of any education benefits to the Student. 20

27

U.S.C. § 1415(f)(3)(E)(ii) ("a Hearing Officer may find that a child did not receive a [FAPE] only if the procedural inadequacies -- (I) impeded the child's right to a [FAPE] . . . or (III) caused a deprivation of educational benefits."); Grim v. Rhinebeck Central Sch. Dist., 2003 U.S. App. LEXIS 27934, *7, 12-13 (2d Cir. 2003) (holding that because the parents had removed the student from the school district and placed her in a private school months before they challenged the IEP for that year, that indicated that the parents would have not altered their placement decision. Further, since the Hearing Officer determined that the IEP at issue provided a FAPE, "[i]n these circumstances, we cannot conclude that [student's] right to a free appropriate public education was in any way endangered. . . .").

This is consistent with the Hearing Officer's decision finding that to the extent any procedural violations occurred, they did not deny the Student a FAPE at any relevant time. (A62). Thus, while the Hearing Officer ordered a PPT meeting and an annual review to consider possible placements for the student (Id.), this did not equate to a finding that the Student was deprived a FAPE for the 2010-11 school year. In fact, had the Hearing Officer found that the Student was denied a FAPE, she would have ordered the Board to provide the Student with an IEP and placement, not to merely consider *possible* placements. Thus, the District Court erred in finding that the Student was denied FAPE for the 2010-11 school year.

28

Finally, implicit in the District Court's determination that *"unless the Board provides an adequate defense,* then, a finding that [the Board] failed to provide FAPE for that school year is proper"[11] (A119-120) (emphasis added) is that circumstances exist in which a school district need not produce an IEP for a particular school year. The Hearing Officer found that those circumstances were present in the instant case. Specifically, the Hearing Officer found unequivocally that the Student was <u>parentally placed</u> (A47), and thus, the Board was not required to develop an IEP for the 2010-11 school year.  However, the District Court did not properly defer to the Hearing Officer on this issue.  Further, the District Court failed to perform <u>any</u> analysis as to whether any perceived procedural violation deprived the Student of a FAPE in the 2010-11 school year. Thus, it was error for the District Court to find that the Board failed to provide the student with a FAPE for the 2010-11 school year.

---

[11] This legal conclusion is not supported by the statute itself nor any Second Circuit precedent, and ignores the Second Circuit requirement that a procedural violation harm the student. <u>See</u> <u>A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Central Sch. Dist.</u>, 553 F.3d 165, 172 (2d Cir. 2009) (holding that "it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA.").

## **CONCLUSION**

For the foregoing reasons, the District Court's Rulings should be reversed to the extent that the District Court ordered reimbursement for the alleged violation of the Does' "stay put" rights and found that the Board had denied the Student a FAPE for the 2010-11 school year.

<div style="margin-left:40%;">

DEFENDANT-APPELLANT,
EAST LYME BOARD
OF EDUCATION

By _____/s/_____
Sheldon D. Myers,  ct13581
Kainen, Escalera & McHale, P.C.
21 Oak Street, Suite 601
Hartford, CT  06106
(860) 493-0870 (tel.)
(860) 493-0871 (fax)
smyers@kemlaw.com (e-mail)
Its Attorneys

</div>

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 7,635 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point font size and Times New Roman.

<div align="right">

_____/s/_____
Sheldon D. Myers,  ct13581
July 29, 2014

</div>

## CERTIFICATION OF SERVICE

The undersigned certifies that on this 29th day of July, 2014, a copy of the foregoing Appellant's Brief was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties who have appearances as of the time of this filing, by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

<div align="right">

_____/s/_____
Sheldon D. Myers,  ct13581

</div>