# 14-1261-(L), 14-1638(XAP)

# United States Court of Appeals

*for the*

# Second Circuit

———————◆———————

JANE DOE, JOHN DOE, by and through his parent Jane Doe,

*Plaintiff-Appellee-Cross-Appellant,*

– v. –

EAST LYME BOARD OF EDUCATION,

*Defendant-Appellant-Cross-Appellee,*

DEPARTMENT OF EDUCATION, CONNECTICUT STATE,

*Defendant.*

_____

ON APPEAL FROM THE FINAL JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT,
THE HONORABLE JANET B. ARTERTON, ON MARCH 17, 2014,
AS AMENDED ON APRIL 4, 2014, 3:11-cv-291 (JBA)

## BRIEF FOR PLAINTIFF-APPELLEE-CROSS-APPELLANT

EILEEN M. HAGERTY
KOTIN, CRABTREE & STRONG, LLP
*Attorney for Plaintiff-Appellee-Cross-Appellant*
One Bowdoin Square
Boston, Massachusetts 02114
(617) 227-7031
ehagerty@kcslegal.com

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................iii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF JURISDICTION....................................................... 2

STATEMENT OF THE ISSUES............................................................ 2

STATEMENT OF THE CASE................................................................ 4

STATEMENT OF FACTS ..................................................................... 7

SUMMARY OF ARGUMENT .............................................................. 20

STANDARD OF REVIEW .................................................................... 23

ARGUMENT ......................................................................................... 23

   I.    THE DISTRICT COURT CORRECTLY HELD THAT THE
         BOARD VIOLATED JOHN'S STAY-PUT RIGHTS, BUT ERRED
         IN PART IN ITS DETERMINATION OF THE AMOUNT DUE MS.
         DOE FOR STAY-PUT EXPENSES .......................................... 23

       A.  The Board Violated John's Stay-Put Rights Pursuant to 20 U.S.C.
            § 1415(j)................................................................................. 23

       B.  The District Court Correctly Held That Stay-Put Was
            Triggered in June 2009 ......................................................... 31

       C.  In Calculating the Amount of Stay-Put Reimbursement Due Ms.
            Doe, the District Court Did Not Err in Any of the Ways the Board
            Alleges ................................................................................... 34

D. In Determining the Amount of Stay-Put Due, the District Court Erred in Failing to Award Reimbursement for Summer Services and Failing to Require the Board to Pay Ms. Doe the Full Value of the Services That It Should Have Provided Under John's Stay-Put IEP ........................................................................................................ 36

II.    THE DISTRICT COURT ERRED IN DENYING REIMBURSEMENT FOR THE COSTS OF JOHN'S UNILATERAL PLACEMENT FOR 2009-2010 ................................................................. 40

A. The Court Erred in Finding the Board's 2009-2010 IEP Appropriate ...................................................................................... 41

B. The Court Erred in Finding John's Unilateral Placement Inappropriate ................................................................................... 54

III.   THE DISTRICT COURT ERRED IN DENYING REIMBURSEMENT FOR JOHN'S 2010-2011 UNILATERAL PLACEMENT ...................................................................................... 60

A. The District Court Correctly Held That the Board's Failure to Develop an IEP for John for 2010-2011 Violated His Right to FAPE .............................................................................................. 60

B. The District Court Erred in Failing to Order Any Relief for the Board's Deprivation of John's Right to FAPE in 2010-2011 ................ 64

CONCLUSION ................................................................. 65

## **TABLE OF AUTHORITIES**

**Page**

**Cases**

*A.E. v. Westport Bd. of Educ.*,
  463 F.Supp.2d 208 (D. Conn. 2006) .............................................................. 10

*A.S. v. Board of Educ. for the Town of West Hartford*,
  47 Fed. Appx. 615 (2d Cir. 2002) ..................................................................... 32

*Alamo Heights Independent Sch. Dist. v. State Bd. of Education*,
  790 F.2d 1153 (5th Cir. 1986) .......................................................................... 65

*Amanda J. v. Clark County Sch. Dist.*,
  267 F.3d 877 (9th Cir. 2001) ............................................................................ 52

*Board of Educ. v. Rowley*,
  458 U.S. 176 (1982) ............................................................................ 8, 41, 45

*Bd. of Educ. v. Schutz*,
  290 F.3d 476 (2d Cir. 2002), *cert. denied*, 537 U.S. 1227 (2003) ........ 27, 28, 31

*Brennan v. Reg'l Sch. Dist. No. 1 Bd. of Educ.*,
  531 F. Supp. 2d 245 (D. Conn. 2007) ..........................................................27-28

*Briere v. Fair Haven Grade Sch. Dist.*,
  948 F. Supp. 1242 (D. Vt. 1996) .............................................................. 58, 61

*Burr v. Ambach*,
  863 F.2d 1071 (2d Cir. 1988) ..................................................................... 39, 64

*C.F. v. New York City Dep't of Educ.*,
  746 F.3d 68 (2d Cir. 2014) ..........................................................47, 51, 52, 53

*C.L. v. New York City Dep't of Educ.*,
  No. 12 Civ. 1676(JSR), 2013 WL 93361 (S.D.N.Y. Jan. 3, 2013), *aff'd*,
  552 Fed. Appx. 81 (2d Cir. 2014) ..................................................................... 53

*C.L. v. Scarsdale Union Free Sch. Dist.*,
   744 F.3d 826 (2d Cir. 2014)................................................................23, 55, 59

*Carlisle Area Sch. Dist. v. Scott P.*,
   62 F.3d 520 (3d Cir. 1995).............................................................................52

*Carmel Cent. Sch. Dist. v. V.P.*,
   373 F. Supp.2d 402 (S.D.N.Y. 2005), *aff'd on other grounds*, ***[check]***
   192 Fed. Appx. 62 (2d Cir. 2006)............................................................29, 30

*Davis v. Wappingers Cent. Sch. Dist.*,
   431 Fed. Appx. 12 (2d Cir. 2011).................................................................61

*District of Columbia v. Abramson*,
   493 F. Supp. 2d 80 (D.D.C. 2007).................................................................63

*District of Columbia v. West*,
   699 F. Supp. 2d 273 (D.D.C. 2010)...............................................................63

*Drinker v. Colonial Sch. Dist.,*
   78 F.3d 859 (3d Cir. 1996).............................................................................32

*E.M. v. New York City Dep't of Educ.*,
   758 F.3d 442 (2d Cir. 2014)...........................................................................47

*E. Z.-L. v. New York City Dep't of Educ.*,
   763 F. Supp.2d 584 (S.D.N.Y. 2011).....................................................25-26, 32

*Florence County School Dist. Four v. Carter*,
   510 U.S. 7 (1993)................................................................................9, 28, 54

*Forest Grove Sch. Dist. v. T.A.*,
   129 S. Ct. 2484 (2009)...................................................................................62

*Frank G. v. Board of Educ. of Hyde Park*,
   459 F.3d 356 (2d Cir. 2006).....................................................................*passim*

*G.B. v. Tuxedo Union Sch. Dist.,*
   751 F. Supp.2d 552 (S.D.N.Y. 2010), *aff'd,*
   486 Fed. Appx. 954 (2d Cir. 2012).........................................................53, 58

iv

*Gabel v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*,
   368 F. Supp. 2d 313 (S.D.N.Y. 2005)............................................... 26

*Gagliardo v. Arlington Cent. Sch. Dist.*,
   489 F.3d 105 (2d Cir. 2007)........................................................ 44

*Gerstmyer v. Howard County Pub. Sch.*,
   850 F. Supp. 361 (D. Md. 1994) ................................................. 62

*Grim v. Rhinebeck Cent. Sch. Dist.*,
   2003 U.S. App. LEXIS 27934 (2d Cir. Oct. 8, 2003)....................... 52

*Honig v. Doe*,
   484 U.S. 305 (1988) ................................................................. 24

*James v. Upper Arlington City Sch. Dist.*,
   228 F.3d 764 (6th Cir. 2000)...................................................... 63

*Joshua A. v. Rocklin Unified Sch. Dist.*,
   559 F.3d 1036 (9th Cir. 2009)..................................................... 35

*K.D. v. Dep't of Educ.*,
   665 F.3d 1110 (9th Cir. 2011) .................................................... 33

*Knable v. Bexley*,
   238 F.3d 755 (6th Cir. 2001)............................................. 58, 61, 62

*Lenn v. Portland Sch. Comm.*,
   998 F.2d 1083 (1st Cir. 1993) .................................................... 10

*L.G. v. Wissahickon Sch. Dist.*,
   Civil Nos. 06-0333, 06-3816, 2011 WL 13572 (E.D. Pa. Jan. 4, 2011)..... 63, 64

*M.C. v. Voluntown Bd. of Educ.*,
   226 F.3d 60 (2d Cir. 2000).......................................................... 35

*M.H. v. New York City Dep't of Educ.*,
   685 F.3d 217 (2d Cir. 2012).................................................... 44, 65

*M.R. v. Ridley Sch. Dist.*,
   Civil Action No. 11-2235, 2012 U.S. Dist. LEXIS 113600
   (E.D. Pa. Aug. 13, 2012), *aff'd*, 744 F.3d 112 (3d Cir. 2014)................... 27, 35

*Mackey v. Board of Educ. for the Arlington Cent. Sch. Dist.*,
   386 F.3d 158 (2d Cir. 2004)......................................................................*passim*

*Mavis v. Sobol*,
   839 F. Supp. 968 (N.D.N.Y. 1993) .................................................................. 8

*Mrs. B. v. Milford Bd. of Educ.*,
   103 F.3d 1114 (2d Cir. 1997)............................................................. 48, 54, 55

*Mrs. C. v. Wheaton*,
   916 F.2d 69 (2d Cir. 1990)............................................................................... 2

*Ms. K. v. Maine Sch. Admin. Dist. No. 40*,
   No. 06-42-P-H, 2006 U.S. Dist. LEXIS 78705
   (D. Me. Oct. 26, 2006) ............................................................................ 63, 64

*Moorestown Twp. Bd. of Educ. v. S.D.*,
   811 F. Supp. 2d 1057 (D.N.J. Sept. 15, 2011) ......................................... 63, 64

*Murphy v. Arlington Cent. Sch. Dist.*,
   86 F. Supp.2d 354 (S.D.N.Y. 2000), *aff'd*,
   297 F.3d 195 (2d Cir. 2002)........................................................ 8, 28, 29, 30

*P. v. Newington Bd. of Educ.*,
   512 F. Supp.2d 89 (D. Conn. 2007), *aff'd*,
   546 F.3d 111 (2d Cir. 2008)......................................................... 10, 11, 39, 65

*P.K. v. New York City Dep't of Educ.*,
   526 Fed. Appx. 135 (2d Cir. 2013) ................................................................ 52

*Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*,
   288 F.3d 478 (2d Cir. 2002)........................................................................... 30

*R.E. v. New York City Dep't of Educ.*,
   694 F.3d 167 (2d Cir. 2012), *cert. denied,* 133 S. Ct. 2802 (2013)...........*passim*

*R.K. v. New York City Dep't of Educ.*,
　　No.09-CV-4478 (KAM), 2011 U.S. Dist. LEXIS 32248, 2011 WL 1131492
　　(E.D.N.Y. Jan. 21, 2011), *adopted,* 2011 U.S. Dist. LEXIS 32235
　　(E.D.N.Y. Mar. 28, 2011) ............................................................................... 59

*R.S. v. Somerville Bd. of Educ.*,
　　Civil No. 10-4215 (MLC), 2011 U.S. Dist. LEXIS 748, 2011 WL 32521
　　(D.N.J. Jan. 5, 2011) .................................................................................24-25

*Regional Sch. Dist. No. 9 Bd. of Educ. v. Mr. and Mrs. M.*,
　　No. 07-01484, 2009 U.S. Dist. LEXIS 71032 (D. Conn. Aug. 7, 2009).......... 63

*Reyes v. N.Y. City Dep't of Educ.*,
　　760 F.3d 211 (2d Cir. 2014)................................................................40, 44, 51

*Sch. Comm. of Burlington v. Dep't of Educ.,*
　　471 U.S. 359 (1985).................................................................................*passim*

*Shaffer v. Weast*,
　　546 U.S. 49 (2005) ......................................................................................... 61

*Stacey G. v. Pasadena Indep. Sch. Dist.*,
　　695 F.2d 949 (5th Cir. 1983).......................................................................... 32

*Student X v. New York City Dep't of Educ.*,
　　Civil Action No. 07-CV-2316, 2008 U.S. Dist. LEXIS 88163
　　(E.D.N.Y. Oct. 30, 2008) ................................................................................ 39

*Susquenita Sch. Dist. v. Raelee S.*,
　　25 IDELR 120 (M.D. Pa.), *aff'd*, 96 F.3d 78 (3d Cir. 1996)......................27, 65

*T.M. v. Cornwall Cent. Sch. Dist.*,
　　Civil Action No. 11 CV 6459, 2012 U.S. Dist. LEXIS 135795
　　(S.D.N.Y. Aug. 7, 2012) ............................................................................27, 37

*T.M. v. Cornwall Sch. Dist.*,
　　752 F.3d 145 (2d Cir. 2014)....................................................................*passim*

*Thomas v. Cincinnati Bd. of Educ.*,
　　918 F.2d 618 (6th Cir. 1990).......................................................................... 32

*Town of Burlington v. Department of Educ. of Massachusetts*,
    736 F.2d 773 (1st Cir. 1984), *aff'd on other grounds*, 471 U.S. 359 (1985)....56

*Union Sch. Dist. v. Smith*,
    15 F.3d 1519 (9th Cir. 1994)......................................................................61-62

*Walczak v. Florida Union Free Sch. Dist.*,
    142 F.3d 119 (2d Cir. 1998)...................................................................*passim*

*Weaver v. Millbrook Cent. Sch. Dist.*,
    812 F. Supp.2d 514 (S.D.N.Y. 2011)................................................................ 33

*Wesolek v. Canadair, Ltd.*,
    838 F.2d 55 (2d Cir. 1988)............................................................................... 35

*Zvi D. v. Ambach*,
    694 F.2d 904 (2d Cir. 1982).........................................................24, 27, 28, 29

## Other Authorities:

20 U.S.C. §§ 1400-1482 ....................................................................................... 1

20 U.S.C. § 1401(3) ............................................................................................. 7

20 U.S.C. § 1401(26)(A).................................................................................... 13

20 U.S.C. § 1412(a)(1)(A) .................................................................................. 7

20 U.S.C. § 1412(a)(10)(A) .........................................................................22, 63

20 U.S.C. § 1412(a)(10)(C) .........................................................................22, 63

20 U.S.C. § 1412(a)(10)(C)(i).............................................................................63

20 U.S.C. § 1412(a)(10)(C)(ii) ........................................................................9, 28

20 U.S.C. § 1414(a)(1).........................................................................................7

20 U.S.C. § 1414(a)(2) ................................................................. 8, 61

20 U.S.C. § 1414(d)(1)(B) ................................................................. 42

20 U.S.C. § 1414(d)(1)(B)(i), (e) ................................................ 9, 41, 61

20 U.S.C. § 1414(d)(2)(A) .............................................................. 8, 61

20 U.S.C. § 1414(d)(4)(A)(i)-(ii) ..................................................... 8, 61

20 U.S.C. § 1414(e) ................................................................... 41, 43

20 U.S.C. § 1415(b)(1) ..................................................................... 41

20 U.S.C. § 1415(e)(1) ..................................................................... 33

20 U.S.C. § 1415(e)(3) ..................................................................... 24

20 U.S.C. § 1415(f) ........................................................................... 9

20 U.S.C. § 1415(f)(3)(E)(ii) ................................................ 21, 41, 42, 62

20 U.S.C. § 1415(g) .......................................................................... 10

20 U.S.C. § 1415(i)(2) ...................................................................... 10

20 U.S.C. § 1415(i)(2)(A) ............................................................ 2, 4, 10

20 U.S.C. § 1415(i)(2)(C)(ii) ............................................................. 10

20 U.S.C. § 1415(j) ................................................................... *passim*

28 U.S.C. § 1291 .............................................................................. 2

28 U.S.C. § 1331 .............................................................................. 2

34 C.F.R. § 300.34 ........................................................................... 13

34 C.F.R. § 300.222 ................................................................. 9, 41, 61

34 C.F.R. § 300.303 ................................................................. 8, 61

34 C.F.R. § 300.321(a)(1) ........................................................ 9, 41, 61

34 C.F.R. § 300.323(a) ............................................................. 8, 61

34 C.F.R. § 300.324(b) ............................................................ 8, 61

34 C.F.R. § 300.501(b) ............................................................ 9, 41, 61

34 C.F.R. § 300.501(c) ............................................................ 9, 41, 43, 61

34 C.F.R. § 300.502(a) ............................................................ 46

34 C.F.R. § 300.507 ................................................................. 9

34 C.F.R. § 300.518(a) ............................................................ 9, 23

Conn. Agencies Regs. §§ 10-76a-15, 10-76d-10, 10-76d-11 ................................ 7

Conn. Agencies Regs. § 10-76d-9 ................................................ 8-9, 61

Conn. Agencies Regs. § 10-76d-9(c)(3) ............................................ 46

Conn. Agencies Regs. § 10-76d-11(a) .............................................. 8, 61

Conn. Agencies Regs. § 10-76d-11(b) .............................................. 8, 61

Conn. Agencies Regs. § 10-76d-12(c) .............................................. 9, 41, 61

Conn. Agencies Regs. §§ 10-76h-1 to 10-76h-3 .................................... 9

Conn. Agencies Regs. § 10-76h-14(a) .............................................. 10, 45

Conn. Agencies Regs. § 10-76h-14(c) .............................................. 10

Conn. Gen. Stat. § 10-76d(a)(1) ................................................... 63

Conn. Gen. Stat. § 10-76h ......................................................... 4

Conn. Gen. Stat. § 10-76h-17(a) ........................................................................ 9, 23

Fed. R. App. P. 25(a)(5) ...................................................................................... 11

Fed. R. App. P. 30 ................................................................................................. 2

Fed. R. Civ. P. 5.2 ............................................................................................... 11

Loc. R. 30.1(g) ...................................................................................................... 2

Assistance to States for the Educ. of Children with Disabilities & Presch.
Grants for Children with Disabilities, 71 Fed. Reg. 46540 (Aug. 14, 2006) ....... 63

Individuals with Disabilities Education Improvement Act of 2004,
Pub. L. 108-446, § 106(c)(8) ............................................................................... 33

## PRELIMINARY STATEMENT

This appeal concerns the rights of a child with a disability, John Doe, and his mother, Jane Doe ("Ms. Doe") (collectively, "the Does"), under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482, and Connecticut law. The Does, plaintiffs-appellees-cross-appellants, oppose the appeal of defendant-appellant-cross-appellee East Lyme Board of Education (the "Board"). The Does seek affirmance of the District Court's decision that they are entitled to reimbursement for the Board's violation of John's "stay-put" rights pursuant to 20 U.S.C. § 1415(j), and that the Board violated John's right to a free appropriate public education ("FAPE") by failing to propose a program for him for the 2010-2011 school year.

The Does cross-appeal from the judgment insofar as it denied in part their motion for summary judgment and granted in part the Board's summary judgment motion, finding no deprivation of FAPE during the 2009-2010 school year and awarding the Does no reimbursement in connection with John's unilateral placement for 2009-2010 or 2010-2011. The Does also cross-appeal on grounds that the District Court erred in determining the amount due them for the Board's violation of John's stay-put rights.

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction pursuant to 20 U.S.C. §
1415(i)(2)(A) and 28 U.S.C. § 1331.[1]

The District Court entered final judgment on March 17, 2014 (amended
April 4, 2014). Defendant's Appendix ("A") at A3-A4. After the Board filed a
notice of appeal on April 16, 2014, A1, the Does filed a timely notice of cross-
appeal on April 30, 2014. Supplemental Appendix ("SA") at 568-69.[2]

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Where the Board refused to provide John with the services specified in
his last agreed-upon individualized education program ("IEP") during the
pendency of disputes over his program and placement for the 2009-2010 and 2010-
2011 school years, did the District Court correctly hold that the Board violated
John's "stay-put" rights pursuant to 20 U.S.C. § 1415(j)?

2. If so, did the District Court correctly hold that the Board was required to
pay the Does for stay-put services incurred beginning as of the date the dispute

---

[1] IDEA incorporates state special education standards that meet or exceed
federal standards. *Mrs. C. v. Wheaton*, 916 F.2d 69, 73 (2d Cir. 1990). To the
extent that the Does sought relief under Connecticut law, the District Court had
jurisdiction under IDEA and 28 U.S.C. § 1331. In the alternative, it had pendent
jurisdiction.

[2] Because the Board did not file a joint appendix in accordance with Fed.
R. App. P. 30, the Does file a supplemental appendix pursuant to Loc. R. 30.1(g).

over John's 2009-2010 IEP arose (June 2009) and continuing at least through the date of entry of judgment?

3. Did the District Court correctly calculate the amount of stay-put reimbursement due Ms. Doe, or did the court err in failing to award (a) reimbursement for summer stay-put services, and (b) the full value of the stay-put services that the Board should have provided, but failed to provide, under John's stay-put IEP?

4. Where the Board developed John's 2009-2010 IEP and determined his 2009-2010 placement outside of the IEP Team process, did the District Court err in finding that no procedural violation had occurred?

5. Where the Board, as the party with the burden of proof in the administrative proceeding, produced little or no evidence that its proposed IEP and placement for the 2009-2010 school year (including summer 2009)[3] would meet John's unique needs, and Ms. Doe proffered extensive evidence that the IEP and placement were not appropriate for John, did the District Court err in deferring to the administrative hearing officer's opinion that the IEP provided John with a FAPE?

_____

[3] Subsequent references herein to the 2009-2010 school year should be understood to include the summer of 2009 unless the context requires otherwise.

6.  Where Ms. Doe presented plentiful evidence in the record that the program she provided for John for 2009-2010 and 2010-2011, consisting of the Solomon Schechter Academy ("SSA") in New London, Connecticut plus specialized services by private providers, appropriately met John's unique needs, did the District Court err in finding to the contrary, thus denying Ms. Doe's claim for reimbursement of expenses connected with that program?

7.  Where the Board failed and refused to propose any IEP or placement at all for John for the 2010-2011 school year (including summer 2010),[4] did the District Court correctly hold that the Board violated John's right to FAPE?

8.  In light of the Board's egregious 2010-2011 violations of John's right to FAPE, did the Court err in failing to grant the Does any relief whatsoever for 2010-2011?

<u>**STATEMENT OF THE CASE**</u>

This is an action for review of an administrative hearing officer's decision in a special education matter, pursuant to 20 U.S.C. § 1415(i)(2)(A) and Conn. Gen. Stat. §10-76h.  A dispute regarding John's IEP and placement arose in June 2009. On September 30, 2010, Ms. Doe filed a due process hearing request with the

---

[4]  Subsequent references to the 2010-2011 school year should be understood to include the summer of 2010 unless the context requires otherwise.

4

Connecticut State Department of Education ("SDE").[5]  A hearing was held before Hearing Officer Elisabeth Borrino on December 1, 15, and 17, 2010.  The hearing officer issued a decision on January 10, 2011, denying all relief that the Does sought.  A43-A63.

The Does commenced this action in the United States District Court for the District of Connecticut by timely filing a complaint on February 24, 2011.[6]  A22-A63.  The parties cross-moved for summary judgment on January 17, 2012 (Docket #38-#48).  With their summary judgment motion the Does submitted additional evidence in the form of affidavits (SA 185-287), which the Court accepted in part and excluded in part by order dated April 12, 2012 (Docket #60).  Essentially, two school years were at issue on the cross-motions: 2009-2010, for which the Board had proposed an IEP, and 2010-2011, for which it had not.  The Does sought reimbursement of Ms. Doe's expenses for the program she provided (SSA plus specialized services) and sought relief for the Board's violation of John's "stay-put" rights.

---

[5]  Ms. Doe originally filed a hearing request on April 28, 2010, which she dismissed voluntarily without prejudice on September 27, 2010.  Administrative Record ("AR," Docket #48) at 204, 208, 376-78.  She re-filed on September 30, 2010.  A183.

[6]  The SDE was originally named as a defendant as well, but was voluntarily dismissed on March 17, 2011 (Docket #16).

The motions were referred to Magistrate Judge Joan Margolis.  On August 14, 2012, she issued a Recommended Ruling, recommending that each motion be granted in part and denied in part.  2012 U.S. Dist. LEXIS 136420, 2012 WL 4344304 (D. Conn. Aug. 14, 2012); A64-A108.  Both parties objected to aspects of the recommendation.  On September 21, 2012, Judge Janet Bond Arterton ruled on those objections, adopting the recommendation with modifications.  2012 U.S. Dist. LEXIS 135486, 2012 WL 4244301 (D. Conn. Sept. 21, 2012); A109-A124. Judge Arterton ordered that

> Defendant's Motion . . . for Summary Judgment is GRANTED in part, in that the 2009-2010 proposed IEP was adequate to provide a FAPE, and DENIED in all other respects.  Plaintiff's Motion . . . for Summary Judgment is GRANTED in part, in that Defendant violated Plaintiff's right to a FAPE in 2010-2011 and violated Plaintiff's stay-put right, and DENIED in all other respects.

A124.  The judge ordered the Board to reimburse Ms. Doe for stay-put services.

On October 12, 2012, the Does filed a memorandum and affidavit detailing the amount of reimbursement due.  *See* SA 288-89.  The Board disputed that amount.  The judge referred the matter to the magistrate judge, who issued a recommended ruling on November 27, 2012.  A125-A139.  Both parties objected to aspects of the recommendation.  On March 17, 2014, Judge Arterton issued a ruling, adopting the recommendation with one modification and ordering the Board to pay Ms. Doe $97,445 for stay-put services she had provided through that date.

A140-A149. On the same date, the Court entered judgment in the Does' favor in that amount. A3. On April 4, 2014, the Court amended the judgment to reflect the earlier dismissal of the SDE. A4. The Board's appeal and this cross-appeal followed.

## STATEMENT OF FACTS

### A. Statutory Framework

IDEA sets out a detailed scheme for the education of children with disabilities, including multiple protections for such students and their parents. In order to receive federal funding under IDEA, a state must ensure that "[FAPE] is available to all children with disabilities residing [therein]." 20 U.S.C. § 1412(a)(1)(A). To determine eligibility for special education, the local educational agency ("LEA," or school district) conducts an evaluation. 20 U.S.C. § 1414(a)(1). Once the student is determined to be a "child with a disability," 20 U.S.C. § 1401(3), an "IEP Team," including LEA representatives and the child's parents, meets to develop an IEP. *See id.* §1414 (d)(1)(A), (B), (d)(2), (d)(3). In Connecticut, this group is known as the "planning and placement team" ("PPT"). Conn. Agencies Regs. §§ 10-76a-15, 10-76d-10, 10-76d-11.

The IEP has justly been termed the "key element of the IDEA," *Frank G. v. Board of Educ. of Hyde Park.*, 459 F.3d 356, 363-65 (2d Cir. 2006), and the "'centerpiece of the IDEA's education delivery system.'" *Mackey v. Board of*

7

*Educ. for the Arlington Cent. Sch. Dist.,* 386 F.3d 158, 160 (2d Cir. 2004) (quoting *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002)).[7]  The IEP must include "a comprehensive statement of the [child's] educational needs . . . and the specially designed instruction and related services to be employed to meet those needs."  *Sch. Comm. of Burlington v. Dep't of Educ.,* 471 U.S. 359, 368 (1985).  In order to constitute FAPE, the IEP services must be "tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'"  *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)).

    The PPT must convene at least annually to review the child's progress and revise the IEP.  20 U.S.C. § 1414(d)(4)(A)(i)-(ii);  34 C.F.R. § 300.324(b); Conn. Agencies Regs. § 10-76d-11(b).  The district must have an IEP in effect for each eligible student at the start of every school year.  20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a); Conn. Agencies Regs. § 10-76d-11(a).  The district must re-evaluate the student triennially.  20 U.S.C. §1414(a)(2); 34 C.F.R. §300.303; Conn.

---

[7]  IDEA has been reauthorized periodically; the current version took effect on July 1, 2005.  Some of the cases cited herein were decided under earlier versions of IDEA or under its predecessor, the Education of the Handicapped Act.  Thus, statutory citations in cases decided under earlier versions of the act may differ from current citations.  Where the statutory language remains similar, those cases remain valid precedent.  *Mavis v. Sobol*, 839 F. Supp. 968, 969 n.1 (N.D.N.Y. 1993).

Agencies Regs. § 10-76d-9. Parents have the right to be present and participate in any meeting at which the IEP is developed, reviewed, or revised, or at which placement is determined. 20 U.S.C. §§ 1414(d)(1)(B)(i), (e); 34 C.F.R. §§ 300.321(a)(1), 300.322, 300.501(b), (c); Conn. Agencies Regs. §10-76d-12(c).

Pursuant to IDEA's "stay-put" provision, if parent and district disagree about the adequacy of the IEP, the district must maintain the child in the last agreed-upon placement pending the outcome of the dispute, unless the parties agree otherwise. 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a); Conn. Agencies Regs. § 10-76h-17(a).

When parents and district disagree about FAPE, the parents may choose to make a unilateral placement by enrolling the child in a private program without the district's consent, at the parent's expense. If the district's proposed program is found not to provide FAPE, and the private placement is appropriate, the district may be required to reimburse the parents for the cost of the private program. *Florence County School Dist. Four v. Carter*, 510 U.S. 7 (1993); *Burlington*, 471 U.S. at 369-70; 20 U.S.C. § 1412(a)(10)(C)(ii).

Either party may seek a due process hearing before an impartial hearing officer ("IHO"). 20 U.S.C. § 1415(f); 34 C.F.R. § 300.507; Conn. Agencies Regs. §§ 10-76h-1 to10-76h-3. In Connecticut, the district has the burden of proving at hearing by a preponderance of the evidence that any challenged IEP or placement

9

is appropriate for the child; parents have the burden of proving the appropriateness of a unilateral placement, also by a preponderance. Conn. Agencies Regs. §§ 10-76h-14(a), (c).

Any party dissatisfied with an administrative decision may bring a civil action in state or federal court, pursuant to 20 U.S.C. § 1415(i)(2).[8] The court applies an "intermediate standard of review," falling somewhere between trial *de novo* and the more customary review of administrative proceedings under the "clear error" or "substantial evidence" standards. *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086-87 (1st Cir. 1993), quoted in *P. v. Newington Bd. of Educ.*, 512 F. Supp.2d 89, 99 (D. Conn. 2007), *aff'd*, 546 F.3d 111 (2d Cir. 2008). The court receives the administrative record and "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii).

On summary judgment motions in IDEA cases, the "court's inquiry is not directed to discerning whether there are disputed issues of fact, but rather whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and the child's educational needs have been appropriately addressed." *A.E. v. Westport Bd. of Educ.*, 463 F.Supp.2d 208, 215 (D. Conn. 2006. Courts must give "due weight" to

---

[8] In states where the initial hearing is conducted by the LEA, review by the state educational agency must precede judicial review. 20 U.S.C. § 1415(g), (i)((2)(A). Connecticut is not such a state.

administrative proceedings, and may not "substitute their own notions of sound educational policy for those of the school authorities they review." *Walczak*, 142 F.3d at 129. However, the court's review must be "searching, and . . . must recognize that even when educational authorities act with the best intentions they may sometimes fall short of their obligations under the IDEA, and courts must then act to ensure compliance with Congress's directives." *P. v. Newington Bd. of Educ.*, 546 F.3d 111, 120-21 (2d Cir. 2008).

**B. Factual Background**

**1. John's Needs and the Parties' Agreement Regarding His 2008-2009 Program and Placement**

John was born in 1999. He was nine years old as of the start of the 2009-2010 school year, ten at the start of the 2010-2011 school year, and eleven as of the filing of the complaint.[9]

John has a complicated learning profile. As clinical psycholinguist Robert L. Kemper, Ph.D., CCC-SLP, has described, while John has high average to superior intelligence, he also has significant language-based learning disabilities. These include an expressive language impairment; a rare disorder involving impairment in learning and using of syntax; disorder of written expression; dyslexia; and dysgraphia. SA 190, 326, 358, 466. John's dyslexia involves a

---

[9] Pursuant to Fed. R. App. P. 25(a)(5) and Fed. R. Civ. P. 5.2, only the year of John's birth is given, in order to protect his privacy.

11

"double deficit" phonological processing disorder, significantly impairing two basic processes underlying literacy skills. SA 190, 326, 358, 466.

John also displays social-pragmatic vulnerabilities and anxiety. Due to his unusual presentation, including awkward speech and movement, hard-to-follow discourse, and obliviousness to social rules, John can have difficulty interacting with peers and is an easy target for bullying and humiliation. SA144, 151. John is easily overwhelmed in large academic environments, which cause him to "shut down" and become unavailable for learning. SA139, 152, 155.

John and Ms. Doe reside in East Lyme, Connecticut. The Board is responsible for operating and managing the East Lyme Public Schools ("ELPS"). Among the Board's duties is ensuring the provision of FAPE for eligible students with disabilities who reside within East Lyme, including John. There is no dispute regarding John's eligibility.

John attended ELPS on IEPs from preschool through mid-first grade. In December 2006, John's PPT determined that his extensive needs required a more specialized setting and placed him at Hope Academy ("Hope"), a private program in Orange, Connecticut.

At a PPT meeting in June 2008 and an August 2008 meeting with Stephen Buck, the Board's then-Director of Special Education, Ms. Doe expressed concerns about Hope's insufficient speech-language therapy, John's lack of progress in

12

reading, and his social difficulties.  Ms. Doe investigated alternatives and
ultimately identified SSA as a possible placement.  In August 2008, the Board and
Ms. Doe agreed that John would begin 2008-2009 (third grade) at SSA at Ms.
Doe's expense on a trial basis. A185-186.

In October 2008, Dr. Kemper evaluated John at Ms. Doe's request.  His
diagnoses are discussed above.  Dr. Kemper's recommendations to address John's
needs included a language immersion program with low student-to-teacher ratio;
daily 1:1 reading instruction using Orton-Gillingham methodology; and at least 2
hours/week of 1:1 speech-language therapy by a certified speech-language
pathologist. SA 368. Ms. Doe searched extensively for a language immersion
program, but was unable to find one within driving distance that would accept
John. SA4-13.

At a December 18, 2008 PPT meeting, Ms. Doe and the Board agreed that
John would remain at SSA with Ms. Doe paying tuition, while the Board would
provide a total of 9 hours/week of special education and related services,[10]
including 1:1 Orton-Gillingham instruction (5 hours/week), 1:1 speech-language
therapy (2.5 hours/week), and 1.5 hours/week of occupational therapy/physical

_____

[10]  "Related services" include "such developmental, corrective, and other
supportive services (including speech-language pathology …, physical and
occupational therapy…) as may be required to assist a child with a disability to
benefit from special education. . . ." 20 U.S.C. § 1401(26)(A); 34 C.F.R.§ 300.34.

therapy ("OT/PT"), all through private professionals. The Board developed an IEP to that effect, which Ms. Doe accepted and the Board implemented. A150-A163. In February 2009, the Board, by agreement with Ms. Doe, amended the IEP, increasing speech-language therapy to 3 hours/week. A166-A169. The amendment was implemented.

In a May 2009 re-evaluation, Dr. Kemper emphasized the uniqueness of John's profile, including his needs for remediation of his severe language impairment and for an educational environment where he felt safe and secure (particularly regarding peer interactions). Dr. Kemper recommended that John remain at SSA, receiving 2 hours/day (10 hours/week) of 1:1 speech-language services and 3 hours/week of 1:1 Orton-Gillingham instruction from providers trained and experienced in remediating significant oral/written language deficits. SA 358, see also SA 119.

## 2. Disputes Over John's Program and Placement for 2009-2010 and 2010-2011

John's PPT reconvened on June 17, 2009. Attendees included Dr. Kemper, Ms. Doe, and SSA Head of School Karen Rosenberg. Dr. Corinne Berglund, Mr. Buck's successor as Director of Special Education, was the only Board representative present. Dr. Berglund announced the Board's refusal to provide services for John if he remained at SSA for 2009-2010. Dr. Berglund raised the

14

possibility that John might attend ELPS' Niantic Center School ("Niantic Center"). Ms. Doe, Dr. Kemper, and others explained that Niantic Center would not meet John's needs. Ms. Doe asserted John's stay-put right to continue receiving the services in his IEP. The meeting ended without identification of a program or placement for John, and without development of IEP goals or objectives. SA 388-89.

In later communications outside the PPT context, the Board informed Ms. Doe that it had decided on Niantic Center as John's 2009-2010 placement. Ms. Doe received an IEP to that effect in July 2009. SA 647-668. The IEP was inappropriate to meet John's needs because, *inter alia*, speech therapy was insufficient (2.5 hours/week instead of the 10 recommended by Dr. Kemper); reading instruction employed an inappropriate "code emphasis" approach; there were insufficient 1:1 services; and the large regular education classes (15-16 students) would exacerbate, rather than address, John's social-emotional needs. SA123-30, 153-58. The Board's proposal was a generic one, not geared to John's individual needs. The Board had no legitimate basis on which to recommend this program, as the evaluations and other information discussed at the PPT did not support it. *See* SA 375-404.

Ms. Doe rejected the 2009-2010 IEP. By letters dated July 1 and 2, 2009, A176-A177, she notified the Board of her intent to provide John with summer

services, which she requested the Board fund. By letter dated July 13, 2009, she requested that the Board place John at SSA for 2009-2010 and provide him with 10 hours/week of 1:1 speech-language therapy and 3 hours/week of Orton-Gillingham instruction. A178-A179. She again stated her intent that the Board fund these services. *Id.* The Board refused. A180.

For 2009-2010 and 2010-2011, Ms. Doe provided a program for John at her own expense, consisting of SSA, specialized services, and transportation. He received speech-language therapy from Geraldine Theadore, M.S., CCC-SLP, and Orton-Gillingham instruction from Janet Campbell, M.A. Both are highly trained and experienced in working with children with serious language impairments.

John made good progress in the program Ms. Doe provided. His reading, writing, spelling, and language skills improved as a result of his specialized services. SA185-205, 226-232, 251-82, 301-02. He also made progress as a result of attending SSA. Although not a special education school, SSA met John's unique academic and social-emotional needs in multiple ways (discussed in detail below).

Ms. Doe sent the Board John's progress reports, report cards, and evaluations as she received them. SA 442-46, 462. The Board repeatedly refused to take any action in response, asserting that it had no obligation to provide any educational program until John enrolled in ELPS. A181; SA 441, 462, 517.

In April 2010, Dr. Kemper re-evaluated John, finding that John had made progress in numerous areas. Dr. Kemper recommended that John continue to attend small classes and that he continue to receive specialized services. Dr. Kemper continued to recommend 3 hours/week of 1:1 Orton-Gillingham but, due to John's progress, recommended reducing speech-language therapy to 1.5 hours/day (7.5 hours/week). SA 479-82.

On April 27, 2010, Ms. Doe filed a due process hearing request, seeking reimbursement of expenses for John's program.

By letter dated June 30, 2010, Ms. Doe informed the Board of summer services that she intended to provide for John, which she requested the Board fund. SA 513. The Board's Assistant Superintendent for Special Education and Pupil Personnel, Brian Reas, responded that the Board would neither fund any services nor provide an IEP unless John enrolled in ELPS. A181; SA 517.

By letter dated August 15, 2010, Ms. Doe notified the Board of her intent to continue John's placement at SSA for 2010-2011, with 7.5 hours/week of 1:1 speech-language therapy and 3 hours/week of 1:1 Orton-Gillingham. A182; SA 518. Again, she requested funding. The Board failed either to respond or to pay for John's 2010-2011 program. The Board failed to convene a PPT, develop an IEP, or determine placement for John for 2010-2011.

Ms. Doe withdrew her first hearing request without prejudice on September 27, 2010, re-filing on September 30, 2010.  A183.[11]  At the hearing in December 2010, Dr. Kemper, Ms. Theadore, Ms. Campbell, Ms. Rosenberg, Ms. Doe, and John testified[12] on the Does' behalf regarding the nature and extent of John's needs, the inappropriateness of the 2009-2010 IEP, the Board's failure to propose any IEP for 2010-2011, and the appropriateness of his unilateral placement.  The Board called only one witness, Mr. Reas, who admitted having no personal knowledge of John and little prior involvement with the case.  Despite the paucity of evidence for the Board's position, the fact that the Board had the burden of proof on the 2009-2010 IEP and placement, and the Board's failure to propose any IEP or placement for 2010-2011, the IHO ruled in favor of the Board and against the Does on all issues.[13]  A43-63.

In connection with their summary judgment motion, the Does submitted additional evidence consisting of affidavits from six individuals: Dr. Kemper, who evaluated John for a fourth time in April 2011; Anthony Bram, Ph.D., a clinical psychologist who evaluated John in June 2011; Ms. Theadore; Ms. Campbell; Ms.

---

[11]  The Appendix includes only the first page of the hearing request.  For a complete copy, see AR 4-30.

[12]  Ms. Rosenberg testified partly in writing and Ms. Theadore entirely in writing.

[13]  For more detailed discussion of the hearing evidence and the IHO's decision, see *infra* pp. 41-59.

Rosenberg; and Ms. Doe. SA 185-287. This evidence, as well as that in the administrative record, shows that John continued to make progress in all spheres – academic, social and emotional – as a result of the appropriate program that Ms. Doe provided.

### 3.  The Board's Refusal to Honor John's Stay-Put Rights

Under the stay-put IEP (February 2009 amendment), John was entitled to receive 5 hours/week of 1:1 Orton-Gillingham instruction, 3 hours/week of 1:1 speech-language therapy, and 1.5 hours per week of OT/PT, all from private providers.  A112; A166-A169.  The Board has refused to fund stay-put services. SA 287-97. Ms. Doe provided speech-language therapy and Orton-Gillingham instruction at her own expense beginning in July 2009.  A166-A169; SA 287-97. She has been largely unable to provide John with OT/PT. SA 287-97.

The District Court calculated that, from the date the 2009-2010 dispute arose through the date of judgment, Ms. Doe was entitled to stay-put reimbursement in the amount of $97,445.  A142-A148.  The court denied reimbursement for summer services.  A147-A148; SA 292-93.  The court also refused Ms. Doe's request for an award reflecting the full value of the services that the Board failed to provide, totaling approximately $147,939.  A147-148; SA 293.

## SUMMARY OF ARGUMENT

This case concerns two types of reimbursement. One is the reimbursement embodied in the judgment, which requires the Board to repay Ms. Doe for services that the Board should have provided but failed to provide pursuant to 20 U.S.C. § 1415(j), in violation of John's stay-put rights. The District Court correctly held that Ms. Doe is entitled to stay-put reimbursement from June 2009 through at least March 17, 2014, although it erred in determining the amount. The second type of reimbursement is that which Ms. Doe seeks for all expenses connected with John's unilateral placement (SSA plus specialized services) for 2009-2010 and 2010-2011. The District Court erred in denying this relief.[14]

The District Court correctly held that the Board violated John's stay-put rights by failing to continue funding the services specified in his last agreed-upon IEP during the pendency of the dispute over his 2009-2010 IEP. The District Court correctly held that stay-put was triggered when that dispute arose (June 2009) and continued at least until entry of judgment. The District Court correctly determined that John's 2008-2009 IEP, as amended in February 2009, is the source of his stay-put right to services during the regular academic year. In calculating

_____

[14] There is some overlap between the stay-put services and those that would be covered by an order requiring reimbursement for the unilateral placement. To the extent that there is, Ms. Doe is of course only entitled to recover once, not twice.

20

the amount of the reimbursement for school-year stay-put services, the District Court did not err in any of the ways that the Board alleges.

The District Court erred in two other ways in determining the amount of stay-put reimbursement, however. First, the Court erred in ruling that John had no stay-put right to summer services. Second, as a matter of equity the court should have required the Board to make John whole by paying the full value of the services it had failed to fund, rather than paying only for those services Ms. Doe could afford to provide.

The District Court erred in denying the Does' claims for reimbursement of 2009-2010 and 2010-2011 unilateral placement expenses. First, the Court erred in finding the 2009-2010 IEP procedurally appropriate. The Court should have concluded that the Board violated Ms. Doe's right to participate in decisions regarding John's program and placement. This violation was serious enough to warrant relief pursuant to 20 U.S.C. § 1415(f)(3)(E)(ii).

Next, the District Court committed equally if not more serious error when it concluded that the 2009-2010 IEP was substantively appropriate and provided John with FAPE. Taking into account the testimony and exhibits submitted at hearing as well as the affidavits submitted to the court, there was a near-total lack of evidence that the IEP could meet John's needs, and plentiful evidence that it would not. The IHO's decision regarding the appropriateness of the 2009-2010

21

IEP was not well-reasoned and is not entitled to deference. The District Court should have found that the Board failed to carry its burden of proof at hearing and that the 2009-2010 IEP failed to provide John with FAPE.

The District Court erred in concluding that John's unilateral placement for 2009-2010 and 2010-2011, consisting of SSA plus specialized services, was not appropriate for him and that Ms. Doe was not entitled to reimbursement for it. The court afforded the IHO's flawed opinion too much deference. In light of all the evidence, including the additional evidence, the District Court should have concluded that Ms. Doe's program for 2009-2010 and 2010-2011 was appropriate, and should have ordered reimbursement.

The District Court correctly ruled that the Board violated John's right to FAPE by failing to develop a 2010-2011 IEP. John was a child unilaterally enrolled in private school for whom FAPE was at issue, pursuant to 20 U.S.C. § 1412(a)(10)(C), not a "parentally placed private school child[]"within the meaning of 20 U.S.C. § 1412(a)(10)(A). Thus, the Board remained obligated to develop an IEP and propose a placement for him for 2010-2011.

Because John's unilateral placement was appropriate, reimbursement should have been ordered for 2010-2011. Moreover, because the Board's 2010-2011 violations of John's right to FAPE were egregious, the District Court erred in failing to order any remedy. Even assuming *arguendo* that the Does were not to be

fully reimbursed for 2009-2010 and 2010-2011, equity requires reimbursement of at least some of their 2010-2011 expenses.

## STANDARD OF REVIEW

The standard of review for each issue raised on the Board's appeal and on the Does' cross-appeal is *de novo*. *See, e.g., C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837 (2d Cir. 2014).

## ARGUMENT

I. **THE DISTRICT COURT CORRECTLY HELD THAT THE BOARD VIOLATED JOHN'S STAY-PUT RIGHTS, BUT ERRED IN PART IN ITS DETERMINATION OF THE AMOUNT DUE MS. DOE FOR STAY-PUT EXPENSES.**

### A. The Board Violated John's Stay-Put Rights Pursuant to 20 U.S.C. § 1415(j).

One of IDEA's most basic procedural rights is the right to "stay-put," or placement pending appeal, pursuant to 20 U.S.C. § 1415(j). The statute provides that, with an exception not relevant here,

> during the pendency of any proceedings conducted pursuant to this section, unless the State or [LEA] and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . .

20 U.S.C. § 1415(j). *See also* 34 C.F.R. § 300.518(a); Conn. Agencies Regs. §10-76h-17(a). Stay-put functions as an automatic injunction, substituting "an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair

ground for litigation and a balance of hardships." *Zvi D. v. Ambach*, 694 F.2d 904,

906 (2d Cir. 1982).[15]  The statutory language as "unequivocal," clearly stating that

"'the child *shall* remain in the then-current educational placement.'"  *Honig v.*

*Doe*, 484 U.S. 305, 323 (1988)(emphasis in original).  As this Court has recently

explained,

> [§ 1415(j)] reflects Congress's decision that all disabled
> children should keep their existing educational program until
> any dispute over their placement is resolved.  It therefore
> requires a school district to continue funding whatever
> educational placement was last agreed upon for the child until
> the relevant administrative and judicial proceedings are
> complete.

*T.M. v. Cornwall Sch. Dist.*, 752 F.3d 145, 170-71 (2d Cir. 2014) (citations

omitted).  To do otherwise "'would amount to a unilateral change in placement,

prohibited by [IDEA].'"  *Mackey*, 386 F.3d at 163 (quoting *Zvi*, 694 F.2d at 906).

Stay-put protection may extend for a number of years.  "The fact that school

years come and go while the litigation is pending . . . does not obviate the

injunctive effect of the stay put provision."  *R.S. v. Somerville Bd. of Educ.*, Civil

---

[15]  *Zvi* and other cases predating the current version of IDEA refer to the
stay-put provision as previously codified at 20 U.S.C. § 1415(e)(3).  The operative
language in the current version, 20 U.S.C. § 1415(j), is virtually identical, except
for certain disciplinary situations not relevant here.  Thus, cases interpreting the
former § 1415(e)(3) outside the disciplinary context retain their force in
interpreting § 1415(j).

No. 10-4215 (MLC), 2011 U.S. Dist. LEXIS 748 at *33, 2011 WL 32521 (D.N.J. Jan. 5, 2011)(citing *Burlington*, 471 U.S. at 370).

It is undisputed that the Board has neither funded nor provided any services for John since June 2009. The District Court correctly held that the Board's failure to do so violated § 1415(j). The court began by quoting this Court's definition of "then-current educational placement" as "(1) typically the placement described in the child's most recently-implemented IEP; (2) 'the operative placement actually functioning at the time . . . when the stay put provision of the IDEA was invoked'; and (3) '[the placement at the time of] the previously implemented IEP." *Mackey,* 386 F.3d at 163 (internal quotation marks and citations omitted; alterations in original); A112. The court correctly found that John's "most recently-implemented IEP" was his December 18, 2008 IEP, as amended February 10, 2009. *Id.*; see A150-A163, A166-169.

The fact that Ms. Doe originally chose SSA, of which the Board attempts to make much, Appellant's Brief ("AB") at 13-16, is irrelevant. Once the Board promulgated and Ms. Doe accepted an IEP providing therapies and tutoring, John had a stay-put right to those services. (Ms. Doe does not assert any stay-put right to SSA tuition.) The fact that the Board provided the services through private professionals, rather than its own employees, is immaterial. *See T.M.,* 752 F.3d at 171; *E. Z.-L. v. New York City Dep't of Educ.*, 763 F. Supp.2d 584, 599 (S.D.N.Y.

2011), *aff'd on other grounds sub nom. R.E. v. New York City Dep't of Educ.,* 694 F.3d 167 (2d Cir. 2012), *cert. denied,* 133 S. Ct. 2802 (2013).

The February 2009 amendment was accepted and implemented. A166-169. When the dispute over 2009-2010 arose, Ms. Doe explicitly invoked John's stay-put right to continue receiving the services specified in the amendment, but the Board refused to continue funding them. SA 376. Thus, the District Court correctly held that the Board violated § 1415(j); that the February 2009 amendment is the source of John's stay-put rights;[16] and that the Board was required to continue providing the services specified therein throughout the pendency of the 2009-2010 dispute. A111-A114.

In an attempt to evade this result, the Board puts forth a confused jumble of arguments, none of which should detain this Court long. First, the Board attempts to impose an appropriateness requirement for stay-put services, arguing that John had no stay-put rights "until (and unless) [the] parent succeeds at due process, which did not occur here." Appellant's Brief ("AB"), p. 13. This statement, like the rest of the Board's discussion (AB13-16, AB20-21), betrays a fundamental misunderstanding of § 1415(j). The Board conflates FAPE analysis, used to determine the merits of disputed substantive claims, with stay-put analysis. The

---

[16] If that IEP amendment is not John's stay-put placement, he would have none, which would be "an impossible result." *Gabel v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 325-326 (S.D.N.Y. 2005).

26

two types of claim "require[e] two distinct analyses," however. *M.R. v. Ridley Sch. Dist.*, Civil Action No. 11-2235, 2012 U.S. Dist. LEXIS 113600 at *15 (E.D. Pa. Aug. 13, 2012), *aff'd*, 744 F.3d 112 (3d Cir. 2014); *see also, e.g., T.M. v. Cornwall Cent. Sch. Dist.*, Civil Action No. 11 CV 6459, 2012 U.S. Dist. LEXIS 135795 at *18 (S.D.N.Y. Aug. 7, 2012) ("the question of whether [the district] offered T.M. a FAPE for the 2010-2011 school year is simply irrelevant" to motion regarding stay-put entitlement).

Stay-put reflects the fundamental principle that "all handicapped children, *regardless of whether their case is meritorious or not,* are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved." *Mackey,* 386 F.3d at 161 (quoting *Susquenita Sch. Dist. v. Raelee S.*, 96 F.3d 78, 83 (3d Cir. 1996) (emphasis supplied by Second Circuit)). *See also, e.g., Bd. of Educ. v. Schutz*, 290 F.3d 476, 484 (2d Cir. 2002), *cert. denied*, 537 U.S. 1227 (2003); *Zvi*, 694 F.2d at 906. Thus, on a stay-put claim the court looks only to see whether the district continued to provide the last agreed-upon placement, without considering the merits of that placement. A parent can be entitled to stay-put payments under this analysis, as Ms. Doe is, whether or not the parent succeeds on a claim for reimbursement based on denial of FAPE. *Brennan v. Reg'l Sch.*

*Dist. No. 1 Bd. of Educ.*, 531 F. Supp. 2d 245, 265 (D. Conn. 2007).[17]  Stay-put is

not, as the Board would have it, contingent on success on the merits; rather, it

operates to protect the student while the merits are being litigated.  This Court

should reject the Board's attempt to undermine the very purpose of stay-put and

should refuse to read an "appropriateness" requirement into § 1415(j) where

Congress and the courts have clearly stated that no such requirement exists.

    The Board's reliance on *Burlington, Florence County, Murphy v. Arlington*

*Cent. Sch. Dist.*, 86 F. Supp.2d 354 (S.D.N.Y. 2000), *aff'd,* 297 F.3d 195 (2d Cir.

2002), and *Zvi* is misplaced (AB12-AB16, AB20-AB21).  *Burlington* is inapposite

because there the parent changed the student's placement; here, the district did so,

in violation of § 1415(j).  The principle that the Board quotes from *Florence*

*County*, 510 U.S. at 15, AB12-13, is irrelevant because it concerns reimbursement

on the merits for a unilateral placement (now codified at 20 U.S.C. §

1412(a)(10)(C)(ii)), not stay-put reimbursement.  Here, as in *Murphy,* "[t]he

---

    [17]  A parent's success at due process may create stay-put rights where none
previously existed, as a favorable administrative decision is considered an
agreement by the state to the parent's proposed placement.  *E.g., Murphy v.
Arlington Cent. Sch. Dist.*, 86 F. Supp.2d 354, 357-361 (S.D.N.Y. 2000), *aff'd,* 297
F.3d 195 (2d Cir. 2002).  In a case such as this one, however, where stay-put rights
arose before the hearing, a favorable decision is not required in order for stay-put
to continue, and an unfavorable decision terminates stay-put only if the parent
chooses not to appeal it.  *See, e.g., Schutz*, 290 F.3d at 484 (stay-put can be
terminated only by parties' agreement of the parties, by an unappealed
administrative decision, or by court).

District has confused the concepts of the current educational or pendent placement with what is ultimately determined to be the appropriate placement for [a future] school year." 86 F. Supp.2d at 359. *Murphy* presented a different situation because the student's stay-put right in that case arose from an IHO's order, not, as here, from a previously-existing IEP. *See id.* at 357-361. The present case is also unlike *Zvi*; here, the district agreed to provide John's 2008-2009 services through an IEP, not through any sort of stipulation or settlement agreement, which limited the student's rights in *Zvi*. *See Murphy*, 86 F. Supp.2d at 359-60 (distinguishing *Zvi*); *Zvi*, 694 F.2d at 907-08. The Board's attempt to divorce "placement" from "payment" (AB15), is unavailing. Where, as here, an IEP created a placement, the district is required to continue paying for the agreed-upon services throughout the pendency of the parent's appeal. *Murphy*, 297 F.3d at 198.

The Board also attempts to argue that John has no stay-put rights on the theory that he was "parentally placed" at SSA during the 2008-2009 school year. AB13, AB16, AB21-AB22. For the reasons discussed *infra* at 62-64, the District Court properly rejected this contention. A118-A121. The 2008-2009 IEP constituted a placement by the district, giving rise to stay-put rights to the services specified therein.

The Board's reference to *Carmel Cent. Sch. Dist. v. V.P.*, 373 F. Supp.2d 402 (S.D.N.Y. 2005), *aff'd on other grounds*, 192 Fed. Appx. 62 (2d Cir. 2006), is

misguided. That case did not concern stay-put; it was a decision on the merits concerning a unilateral placement, for which the court denied reimbursement in part because it found that the parents had deliberately thwarted the IEP process. *Id.* at 418 (parents engaged in years of "egregious misconduct and obfuscation," including concealing information and providing misleading information about the child). Ms. Doe has engaged in no such misconduct in this case. In fact, it was she who kept attempting to communicate with the Board from June 2009 on, sending the Board John's progress reports and other updates. The Board rebuffed her attempts. SA 441, 462, 517.

The Board alludes to the fact that the IHO did not order stay-put relief and asserts that the Does did not present testimony or argument on this issue (AB20). There is no exhaustion requirement for a stay-put claim, however. *Murphy*, 297 F.2d at 199-200. The Does did raise the issue of stay-put before the IHO in any event. *See* SA 376.

The Board further shows its ignorance of stay-put when it asserts that it need not reimburse Ms. Doe for stay-put services that she provided during 2011-2012, 2012-2013, or 2013-2014 because she did not file hearing requests concerning those years (AB23). In support of this surprising theory, the Board cites only one case, *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478 (2d Cir. 2002). *Polera* is not relevant because it concerned only the general

30

obligation to exhaust IDEA claims, and did not involve stay-put.  As this Court has stated, stay-put extends "*until the dispute with regard to their placement is ultimately resolved,*" no matter how long that takes.  *Mackey,* 386 F.3d at 161 (emphasis supplied); *see also T.M.,* 752 F.3d at 171 (stay-put continues "until the relevant administrative and judicial proceedings are complete"); *Schutz*, 290 F.3d 476 at 484.  John's stay-put rights date back to the date when the 2009-2010 dispute arose, and continue until that dispute is finally resolved in the courts.  Ms. Doe need not file hearing requests on subsequent school years in order to keep those rights alive.  The District Court properly so ruled.  A114.

For all of the reasons discussed above, the District Court correctly held that the Board violated John's stay-put rights to continue receiving the services specified in the February 2009 IEP amendment at the district's expense pending the outcome of the dispute over John's 2009-2010 IEP.  This Court should affirm that conclusion.

**B.  The District Court Correctly Held That Stay-Put Was Triggered in June 2009.**

This Court should also uphold the District Court's ruling that John's stay-put right was triggered by Ms. Doe's rejection of the 2009-2010 IEP and explicit invocation of stay-put in June 2009.  A112-A113; see SA 376.  The District Court properly relied on this Court's recognition that stay-put is "a procedural right that

31

is activated *as soon as the PPT reaches an impasse*." *A.S. v. Board of Educ. for the Town of West Hartford,* 47 Fed. Appx. 615, 616 n.2 (2d Cir. 2002) (emphasis supplied). *See also, e.g., Drinker v. Colonial Sch. Dist.,* 78 F.3d 859, 867 (3d Cir. 1996); *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 625-66 (6th Cir. 1990).

There are sound legal and policy reasons to conclude that stay-put attaches when a dispute arises, rather than when administrative proceedings commence. The emphasis of § 1415(j) is on prevention of disruption to the student and on seamless provision of services throughout the period of a dispute. *See, e.g., Stacey G. v. Pasadena Indep. Sch. Dist.*, 695 F.2d 949, 953 (5th Cir. 1983); *E. Z.-L.*, 763 F. Supp.2d at 598. Stay-put is intended to prevent a district's unilateral change in a child's services or placement, which Congress viewed as so reprehensible that it determined to require districts to maintain a child's placement in the event of a dispute, regardless of the merits. Were stay-put protection not to attach until parents commenced due process proceedings, there would be, in almost every case, a period of days, weeks, or months before such proceedings were underway, during which (under the Board's argument) districts would be free to do as they like. Districts could cease funding during that hiatus, which often has the effect of terminating a placement, or they could refuse to admit a child to his placement. This was clearly not what Congress intended when it enacted § 1415(j). The effect of the Board's interpretation, if accepted, would be to require parents to race to

commence due process on the very day that they reject an IEP. This would catapult the parties immediately into formal adversarial proceedings, and would not allow them to take advantage of "expanded opportunities to resolve their disagreements in positive and constructive ways," which IDEA 2004 emphasized. Individuals with Disabilities Education Improvement Act of 2004, Pub. L. 108-446, § 106(c)(8); *see also* 20 U.S.C. § 1415(e)(1) (requiring mediation procedures for disputes "including matters arising prior to the filing of a [due process] complaint"). Again, Congress did not intend that result.

In support of its argument, the Board cites only two cases, *Weaver v. Millbrook Cent. Sch. Dist.*, 812 F. Supp.2d 514 (S.D.N.Y. 2011), and *K.D. v. Dep't of Educ.*, 665 F.3d 1110 (9th Cir. 2011). The Court should follow neither. As the District Court discussed (A113), *Weaver* is distinguishable because stay-put was based on an unappealed administrative decision, not on a previously-existing IEP. *K.D.* is also easily distinguishable, and in fact resembles *Zvi,* because there the student's rights were limited by a settlement agreement. The Ninth Circuit was not interpreting a situation such as this one, where the student's rights flow continuously from his last implemented IEP. The Does submit, moreover, that *Weaver* and *K.D.* were wrongly decided. In neither case did the court carefully

33

consider the purposes and policies behind § 1415(j), which compel the result reached by the District Court.[18]

### C. In Calculating the Amount of Stay-Put Reimbursement Due Ms. Doe, the District Court Did Not Err in Any of the Ways the Board Alleges.

The Board attempts to assign error in the District Court's calculation of the amount due Ms. Doe for Ms. Campbell's services (AB23-AB24). Contrary to the Board's assertion, however, Ms. Doe submitted detailed information regarding the services provided by, and dollars paid to, Ms. Campbell. SA 291-92, 294. To the extent that the District Court's calculations (A138, A145) rest on an exhibit that the Board itself submitted (A194, Exhibit D to Defendant's Memorandum of Law in Opposition to Plaintiff's Memorandum of Law in Support of "Stay Put" Reimbursement, Docket #85), the Board should not be heard to complain.

Contrary to the Board's assertions (AB23), Ms. Doe did provide evidence regarding the services John continued to receive after the Court's September 2012 summary judgment ruling. SA 295. The District Court correctly found Ms. Doe

---

[18]  The Does note that in this case a previous administrative proceeding, challenging the 2009-2010 IEP, was pending for five months (April 28, 2010- September 27, 2010; see A75 n.13, A89 n.27) before this one was commenced. The Board failed to pay for John's stay-put services during the pendency of either case. Even assuming *arguendo* that the Court is disposed to accept the Board's argument regarding the trigger (which, for the reasons discussed above, it should not), the Board should be required to reimburse Ms. Doe for stay-put services during the pendency of both matters.

entitled to stay-put reimbursement at least through the entry of final judgment. A144; s*ee, e.g., Ridley,* 744 F.3d at 125-28; *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1040 (9th Cir. 2009).[19]

The Board also attempts to assert that the District Court should have awarded reimbursement based not on the 3 hours/week of speech-language therapy specified in the February 2009 IEP amendment, but on the 2.5 hours in the December 2008 IEP. As an initial matter, the Board waived that argument by failing to object to the portion of the Magistrate Judge's recommended ruling on summary judgment (A68-A69, A107-108 n.54) that specified 3 hours, rather than 2.5. *Wesolek v. Canadair, Ltd*., 838 F.2d 55 (2d Cir. 1988). Moreover, there is no evidence in the record to support any contention that February 2009 IEP's change from 2.5 to 3 hours was anything other than permanent. The change was coextensive with the period remaining in the IEP (until June 22, 2009). A169. It was no more "temporary" than any other service in any student's IEP, and there was no "express limitation" to the end of the school year, as the Board mistakenly contends (AB24).

---

[19] The cases that the Board cites (AB23 n.10), *M.C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000), and *Walczak*, are inapposite. Once again, the Board confuses merits-based FAPE analysis with stay-put analysis.

**D. In Determining the Amount of Stay-Put Due, the District Court Erred in Failing to Award Reimbursement for Summer Services and Failing to Require the Board to Pay Ms. Doe the Full Value of the Services That It Should Have Provided Under John's Stay-Put IEP.**

The Does submit that the District Court erred in two respects as to the reimbursement award due them. The court should have included summer services in the calculation, and the court should have required the Board to pay Ms. Doe the full value of the services that it failed to provide, not just the amount Ms. Doe was able to afford.

1. **Summer Services**

The District Court declined to order reimbursement for summer services on the theory that "summer services are outside the scope of the stay-put IEP." A148. The December 2008 and February 2009 IEPs did not state that John had no need of summer services. Rather, they left the "Extended School Year Services" section blank, A163, A169, presumably to be discussed at a future date when the PPT convened to develop the next IEP (which is exactly what happened). No one contends that John does not require summer services. Rather, the Board has consistently acknowledged John's need for summer services in IEPs developed before and after February 2009. SA 571, 594, 621, 646, 667. Because the February 2009 amendment did not cover the summer months (it ended as of June

36

22, 2009, see A169), summer 2009 services were proposed in John's next IEP. SA
667.

Given that John requires summer services, and given that Ms. Doe rejected
those proposed in the 2009-2010 IEP, he was entitled to receive stay-put services
for summer 2009 and following summers. To determine what the stay-put summer
services are, as with any other services, the Court looks to the IEP that was "most
recently implemented," "actually functioning," or "previously implemented," as of
the time the dispute arose. See discussion *supra*. Just as an agreed-upon IEP that
contains only summer services can form the basis of a student's stay-put
entitlement during the ensuing school year, *T.M.*, 2012 U.S. Dist. LEXIS 135795 at
*14-*15, so in this case, where John's February 2009 IEP did not extend to
summer services, stay-put requires that the services specified therein (5 hours/week
of Orton-Gillingham, 3 hours/week of speech-language therapy, and 1.5
hours/week of OT/PT) be used to calculate John's stay-put services for summers
beginning with 2009. These amounts should be included in the Court's calculation
of the relief due for the Board's violation of John's stay-put rights.

In the alternative, if the last IEP to specify summer services before February
2009 were found to be John's summer stay-put placement, then the IEP developed
in June 2008 would entitle him to summer services as set forth therein (30 hours of
academic instruction and 5 hours of speech-language therapy per summer). SA

646. Those services were not actually implemented; for the last implemented summer services, one would need to go back to the June 2007 IEP, which specified reading and language arts instruction 10 hours/week for 5 weeks. SA 571. Using either measure, Ms. Doe is entitled to reimbursement for services beginning with summer 2009.

### 2. Full Value of Missed Services

The Does requested below that the court order reimbursement based on the value of the services that John should have received under the stay-put IEP, rather than the lesser value of the services Ms. Doe was actually able to provide. Although the court stated that Ms. Doe was "entitled to reimbursement for those services *contemplated by* the stay-put IEP," A148 (emphasis supplied), the court viewed an award of out-of-pocket expenses as "appropriate to compensate Plaintiff for the violation of his stay-put rights because it reimburses Ms. Doe for her actual expenses." A147. Ms. Doe submits that, as a matter of equity, John will not be made whole for the Board's egregious violations of his stay-put rights unless the Board is ordered to pay for services in the full amount contemplated by the stay-put IEP.

As this Court has recognized, "it is within the district court's authority to order [a district] to reimburse [the] parents for pendency services up to the amount that it would have cost [the district] itself to provide the required pendency

services." *T.M.*, 752 F.3d at 172. This "'merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance.'" *Id.* (quoting *Burlington*, 471 U.S. at 370-71). Here, the Board "ignored the plain language of the [stay-put] statute and regulations and deprived [John] of services to which [he] was unequivocally entitled regardless of the merits of his case," *Student X v. New York City Dep't of Educ.*, Civil Action No. 07-CV-2316, 2008 U.S. Dist. LEXIS 88163 (E.D.N.Y. Oct. 30, 2008) at *77, causing him to experience "the 'precise unfortunate result' that the pendency provision was designed to prevent." *Id.* at *76. In these circumstances, the District Court could and should have exercised its equitable jurisdiction to order payment to enable John to receive the full amount of missed services. *Id.* at *72-*80. *See also, e.g., P. v. Newington*, 546 F.3d at 122-23; *Burr v. Ambach*, 863 F.2d 1071 (2d Cir. 1988).

The District Court's reimbursement order focused too much on Ms. Doe's pocketbook, and not enough on John's need for services. The judgment does not make John whole. It represents perhaps half the amount of services that the stay-put IEP required the Board to provide over the course of nearly five years; he must now forgo the other half. In addition to the effect on John, there are important policy reasons not to allow this to happen. If the District Court's order stands, the effect will be to reward the Board for its flagrant violations of the Does' rights,

39

which in turn will encourage school districts to flout the procedural protections of

IDEA and will mean that only the most well-to-do families, who can afford to

provide services when a district does not, will enjoy the full protection of 20

U.S.C. § 1415(j).  For all of these reasons, the Does urges this Court not only to

uphold the order finding that the Board violated John's stay-put rights (based on

the February 2009 IEP) beginning when the dispute arose in June 2009, but to

modify the judgment to require the Board to pay the full amount that it should have

provided to John (but deliberately refused to provide) under IDEA's stay-put

provision.

## II.     THE DISTRICT COURT ERRED IN DENYING REIMBURSEMENT FOR THE COSTS OF JOHN'S UNILATERAL PLACEMENT FOR 2009-2010.

A parent who unilaterally places a disabled child in a private program is

entitled to reimbursement of the costs of that program if the evidence shows "(1)

the proposed IEP failed to provide the student with an appropriate public

education; (2) the parent's private placement was appropriate to the child's needs;

and (3) equitable considerations support the parent's claim." *Reyes v. N.Y. City*

*Dep't of Educ.*, 760 F.3d 211, 215 (2d Cir. 2014).

To determine whether an IEP is appropriate, the Court employs a two-part

test.  The Court first "examines  the procedural adequacy of the IEP, asking

'whether the state has complied with the procedures set forth in the IDEA.'"  *T.M.*,

at *61] (2d Cir. 2014) (quoting *R.E.*, 694 F.3d at 190). A procedural violation will entitle parents to reimbursement if it "'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child,' or 'caused a deprivation of educational benefits.'" *T.M.*, 752 F.3d at 160 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). Secondly, the Court "examines the substantive adequacy of the IEP by asking whether it was 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* (quoting *Rowley,* 458 U.S. at 207).

### A. The Court Erred in Finding the Board's 2009-2010 IEP Appropriate.

#### 1. The 2009-2010 IEP Violated the Does' Procedural Rights to FAPE.

One of a parent's most important procedural rights is the right to participate in IEP Team meetings. *Rowley,* 458 U.S. at 205-206. *See* 20 U.S.C. §§ 1414(d)(1)(B)(i), (e), 1415(b)(1); 34 C.F.R. §§ 300.321(a)(1), 300.322, 300.501(b), (c); Conn. Agencies Regs. § 10-76d-12(c). Parents are guaranteed the right to "be members of any group that makes decisions on the educational placement of their child." 20 U.S.C. § 1414(e). The Does appeal from the District Court's determination that the 2009-2010 IEP was developed in accordance with IDEA's procedural requirements (A115-A116). It most certainly was not.

41

Ms. Doe attended the June 17, 2009 PPT meeting, as did Dr. Kemper, Ms. Theadore, Ms. Rosenberg, and others who knew John. These professionals stated that John continued to require placement in the small, supportive environment at SSA, with specialized services consisting of 1:1 speech-language therapy and Orton-Gillingham instruction. *See, e.g.*, SA 380-85. Dr. Berglund, the sole ELPS representative at this meeting, did not present or identify any additional or contrary evaluative evidence. As of the meeting's close, no IEP goals and objectives had been developed, nor had any decision been reached about John's program or placement for 2009-2010 or summer 2009. SA 388-89.

At some point between June 17 and Ms. Doe's visit to ELPS' administrative office on June 26, 2009, the Board unilaterally developed the 2009-2010 IEP, deciding on its own to propose placement at Niantic Center. The June 26, 2009 discussion was not a PPT meeting, as it lacked participants required by 20 U.S.C. 20 U.S.C. § 1414(d)(1)(B). SA 408. Dr. Berglund informed Ms. Doe (and the IEP states) that the Board's decisions were based on the PPT discussion of service providers' evaluations, yet the IEP could not possibly have been based on those evaluations because it deviates so greatly from the recommendations at the PPT. SA 407-413. This violation resulted in the development of an inappropriate IEP that deprived John of FAPE. 20 U.S.C. § 1415(f)(3)(E)(ii).

42

Although the District Court acknowledged that "parental participation means something more than mere presence," A115, it overlooked the fact that Ms. Doe was not even present when salient decisions about John were made. When she left the PPT on June 17, all agreed that John's IEP and placement (summer and school-year) remained to be determined. SA 388-89. When she arrived at the meeting with Board administrators 9 days later, she was presented with a *fait accompli*. SA 406-16. The Board thus violated Ms. Doe's right to be a "member[] of any group that makes decisions on the educational placement of [the] child." 20 U.S.C. § 1414(e); 34 C.F.R. § 300.501(c). She was not included in the group that determined either John's general placement type or its actual location; the Board did that on its own. The court believed that the IEP passed muster because "Defendant reviewed John Doe's evaluations and provided Jane Doe with an opportunity to participate in the PPT." A116. This may be true as far as it goes, but it misses the point. The Board deprived Ms. Doe of the opportunity to participate in John's placement decision by removing that decision from the PPT altogether, and making the decision itself. Thus, the District Court erred in finding no procedural violation.

### 2. The 2009-2010 IEP Was Substantively Inappropriate and Failed to Meet John's Needs.

The District Court erred in concluding that the 2009-2010 IEP was appropriate to meet John's unique needs. The court gave the IHO's opinion too

43

much deference – deference that was unwarranted because the IHO's decision was deeply flawed. It was poorly reasoned, failed to hold the Board to its burden of proof, impermissibly allowed retrospective evidence, and failed to accord any weight to unrebutted testimony by the Does' witnesses. The magistrate judge believed that, "[w]hile the [IHO's] conclusion may not have been the conclusion reached by this Court, this Court is bound by the deferential standard applied in a case such as this." A97 n.35. The judge, in turn, found that the magistrate judge "properly gave deference to the decision." A117. The District Court should not have deferred to the IHO's decision in this case, however.

As this Court has recently stated, the "quality and thoroughness of the reasoning" is one of the factors affecting the weight to be given an administrative decision. *Reyes*, 760 F.3d at 218. Factual findings "'must be reasoned and supported by the record' to warrant deference." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 241 (2d Cir. 2012) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 114 (2d Cir. 2007)). The quality of the reasoning is important: "Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not." *Id.* at 244. In this case, the IHO's decision was long on verbiage but short on actual analysis. Her conclusions were unsupported by the record.

The Board – not Ms. Doe – had the burden of proving the 2009-2010 IEP appropriate. Conn. Agencies Regs. § 10-76h-14(a). In order to do so, the Board needed to show that the IEP was "'tailored to meet the unique needs of a particular child,'" namely John. *Walczak*, 142 F.3d at 122 (quoting *Rowley*, 458 U.S. at 207); *see also Frank G.*, 459 F.3d at 363. The Board offered no evidence to identify what John's actual need were for 2009-2010, or what services and placement he required to meet those needs. The Board presented virtually no current, credible evidence at the hearing, or at the June 2009 PPT, to rebut the reasoned conclusions of the evaluators and service providers working with John. For example, the Board did not explain why the IEP reduced John's speech-language services for 2009-2010, despite Dr. Kemper's express recommendation that they needed to be increased. Nor did the Board explain why John's specialized services should not all be provided 1:1, as Dr. Kemper recommended, or how Niantic Center would address his social-emotional needs, in light of multiple witnesses' testimony that it would not meet those needs.

The Board's sole witness was Mr. Reas, its employee for less than six months. Mr. Reas is an administrator with a teaching background; he is not a speech-language pathologist or psycholinguist, nor is he trained in Orton-Gillingham instruction. He testified that he had never actually met John (except when John testified briefly on the first day of hearing), nor had he or any other

45

district representative observed John's program. Mr. Reas stated that John has "been part of our system since he turned three, so there's ... a collection of people who have probably – who probably know him," but was unable to identify even one such person (nor did one testify). SA 171.[20]

Mr. Reas was remarkably uninformed even about the plentiful information that Ms. Doe had submitted to the district. He did not speak with Dr. Kemper before the hearing. He and his "coordinator," Regina Olearczyk, were the only district staff to review Dr. Kemper's evaluations. SA 175. As Mr. Reas is not a speech-language pathologist or psycholinguist, nor as far as can be ascertained from the record is Ms. Olearczyk, it appears that no one with experience and training comparable to Dr. Kemper's reviewed, considered, and understood his reports. Mr. Reas admitted that he discounted Dr. Kemper's evaluations "because they weren't done as part of the school's evaluation process."[21] Mr. Reas never communicated with Ms. Theadore or with Ms. Campbell, nor had any Board representative with equivalent experience reviewed their reports. SA171, 174-176.

---

[20] The IHO erred by making a similarly unfounded assumption ("I'm assuming that the other people at the PPT saw the child, we have the regular ed. teacher, . . . we have assistant principal, we have principal," SA 170) when in fact no regular education teacher, principal, or assistant principal employed by the Board attended the PPT, and no such person testified for the Board or supported the 2009-2010 IEP.

[21] The Board thus violated its obligation to consider *all* relevant information about John's needs, including parent-provided independent educational evaluations. *See* 34 C.F.R. § 300.502(a); Conn. Agencies Regs. § 10-76d(9)(c)(3).

Mr. Reas never spoke with Ms. Rosenberg. SA 177. Mr. Reas had not even spoken

with Mr. Buck, who was involved with John's program until December 2008.

When Mr. Buck sought an opportunity to speak with him, Mr. Reas refused to do

so.

On direct examination, Mr. Reas gave no testimony and expressed no

opinion about the 2009-2010 IEP.  SA166-84.  He asserted that Dr. Kemper's

recommendations all could be provided within ELPS, (SA183-84); however, since

the IEP itself failed to offer services and a placement consistent with those

recommendations, this is the type of "retrospective testimony" that this Court has

recently held cannot cure a deficient IEP.  *R.E.,* 694 F.3d at 185; *see also E.M. v.

New York City Dep't of Educ.*, 758 F.3d 442, 462 (2d Cir. 2014); C.*F. v. New York

City Dep't of Educ.*, 746 F.3d 68, 79 (2d Cir. 2014).

Mr. Reas stated a belief that the 2009-2010 IEP providing 2.5 hours/week of

speech therapy, instead of the 10 hours/week that Dr. Kemper recommended,

"could be FAPE." SA 172.  However, Mr. Reas failed to establish that an IEP

providing 2.5 hours per week of speech *would* constitute FAPE *for John*, in light of

John's needs. When asked the basis for his opinions, Mr. Reas stated generalities

about his experience working with other students. SA173-74. Because IDEA

requires an individually-tailored IEP and personalized instruction, the needs of

other students with other disabilities Mr. Reas may have known, and the possible

appropriateness of other IEPs he may have seen, have no relevance to *John's* 2009-2010 IEP.

To provide FAPE, an IEP must offer the student the opportunity to make "meaningful progress." *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir. 1997). Mr. Reas' opinion about the 2009-2010 IEP should have carried no weight, given that he did not know John well enough to know whether he had made progress at SSA, (SA 126), let alone whether he could make progress under the IEP. Mr. Reas' lack of knowledge did not stop him from opining about the IEP's ability to meet John's social and emotional needs, however. Based only on "[h]aving seen [John]," (SA 179) – not in an educational context, just having laid eyes on him when he testified briefly (SA167-68) – Mr. Reas opined that John "is not unlike other students who have needs" for physical and psychological safety, and that John could therefore attend ELPS. SA179-80. This opinion lacks any basis, is not individualized to John's particular needs, and the IHO should have given it no weight.

By contrast, Ms. Doe presented plentiful evidence about John's needs. Ms. Doe presented the reports and recommendations of Dr. Kemper, a highly-qualified psycholinguist. Dr. Kemper explained John's unique profile and the difficulty of finding everything John needs in one existing program. He testified that John required a small, structured program such as SSA, with small classes and a low

48

student-to-teacher ratio. He further stated that in 2009-2010 John needed to receive 2 hours/day (10 hours/week) of 1:1 therapy by a trained speech-language pathologist such as Ms. Theadore, and 3 hours/week of Orton-Gillingham instruction by a certified tutor such as Ms. Campbell.

Ms. Campbell testified that John needed to continue the 1:1 Orton-Gillingham instruction 3 hours/week in order to make progress. Dr. Kemper and Ms. Campbell explained that many of the IEP's goals and objectives were not appropriate given John's functioning level, and that the proposed "code emphasis" reading program would not meet his needs. They also explained why all of John's specialized instruction needed to be provided 1:1, rather than in the IEP's unspecified mixture of 1:1 and group settings.

Ms. Rosenberg, Ms. Campbell, Dr. Kemper, and Ms. Doe all testified to John's vulnerability to feeling shamed, humiliated, and targeted by other children and to his need to feel safe and comfortable in his educational environment in order to benefit from academic instruction. Each stated that the larger Niantic Center environment was not appropriate for him.

In light of the paucity of the Board's evidence regarding substantive appropriateness of the IEP, and the plentiful evidence of its inappropriateness presented by Ms. Doe, the IHO's finding that the 2009-2010 IEP was appropriate and provided John with FAPE was clearly contrary to the weight of the evidence.

49

Moreover, her opinion contains little analysis or explanation of her conclusion. She did note Dr. Kemper's recommendations, and some of the ways in which he had found the 2009-2010 IEP inappropriate. As discussed above, Dr. Kemper's testimony (as well as other testimony by Ms. Campbell, Ms. Rosenberg, and Ms. Doe) was unrebutted. The IHO did not cite any countervailing evidence in support of her conclusion. Rather, she simply listed the services to be provided under the IEP, without considering whether they satisfied John's particular needs (which, according to the unrebutted testimony, they did not), and stated that the IEP provided FAPE.

With regard to the proposed ELPS placement, she stated that "[n]o evidence was provided that either of . . . two schools [Niantic Center or Flanders Elementary] would be inappropriate." This was incorrect, as credible witnesses with knowledge of John – Dr. Kemper, Ms. Campbell, Ms. Rosenberg, Ms. Doe – all testified that placement in classes of 15-16 students within a public school setting was inappropriate to meet John's social-emotional needs, that it would render him unavailable for learning, and that he required a small, supportive school setting with small classes and low student-to-teacher ratio in order to receive FAPE. Equally troubling is the fact that the IHO's statement betrays her impermissible shifting of the burden of proof from the Board to Ms. Doe. This

alone should "decrease [the court's] confidence in the thoroughness of [her] decision."  *Reyes*, 760 F.3d at 219 n.5.

The IHO's only acknowledgment of the voluminous evidence of the IEP's inappropriateness was her statement that "[a]lthough Dr. Kemper opined that the Student requires a private day placement since he looks different and would be subject to bullying, this was not persuasive."  A56. She ignored the many other reasons why Dr. Kemper found the IEP inappropriate (*e.g.,* insufficient speech-language services, insufficient 1:1 services, inappropriate reading approach, inappropriate goals and objectives).  The IHO also ignored the many other witnesses (Ms. Campbell, Ms. Rosenberg, and Ms. Doe) who testified to John's social-emotional needs for a placement in a small, supportive environment.  She did not cite any evidence that ELPS would meet John's needs (nor could she, in light of the lack of any basis for Mr. Reas' assertions to that effect, discussed above).[22]

The IHO's conclusory statements hardly constitute the type of "thorough and careful" review that would be entitled to deference.  *Walczak*, 142 F.2d at 129.

---

[22]  The IHO alluded to a statement that Dr. Berglund made during the June 2009 PPT meeting, to the effect that "Niantic Center School is small and staffed with a highly qualified special education teacher." A56. Dr. Berglund did not testify at hearing.  The classes that she characterized as "small" contained 15-16 students; Dr. Kemper and other witnesses established that John requires classes of no more than 6-8 students, plus a small, supportive environment overall.  The qualifications of a particular teacher whom John might have had constitute retrospective evidence which, as discussed above, is impermissible.  *C.F.,* 746 F.3d at 80.

This Court has stated that a court, in reviewing an administrative decision, may not "ch[oo]se between the views of conflicting experts on a controversial issue of educational policy." *Grim v. Rhinebeck Cent. Sch. Dist.*, 2003 U.S. App. LEXIS 27934 (2d Cir. Oct. 8, 2003). In this case, however, there were no conflicting experts, as the Board did not present the testimony of any witness qualified to dispute Dr. Kemper's and Ms. Campbell's findings and recommendations. The IHO did not explain why she found their conclusions unpersuasive. Ordinarily, an IHO's assessment of credibility is entitled to deference. However, where, as here, "'the record read in its entirety would compel a contrary conclusion,'" the Court can and should give the [IHO's] credibility determination no weight. *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 889 (9th Cir. 2001) (quoting *Carlisle Area Sch. Dist. v. Scott P.*, 62 F.3d 520, 528-29 (3d Cir. 1995)).

This case resembles recent cases such as *R.E.*, where this Court affirmed the district court's decision not to defer to an administrative decision that was "contrary to the overwhelming weight of the evidence," when all expert reports, which were unrebutted, established the student's need for a different methodology from that proposed in the IEP. 694 F.3d at 194. *See also C.F.*, 746 F.3d at 81 (all witnesses familiar with student testified that he required 1:1 placement); *P.K. v. New York City Dep't of Educ.*, 526 Fed. Appx. 135, 140 (2d Cir. 2013)(no

evidence to support conclusion that amount of speech therapy was appropriate; record showed the contrary).

The District Court, upholding the IHO's decision, pointed to the fact that the IHO "referred to the testimony of several of Plaintiff's witnesses in her findings of fact." A117. Merely summarizing the evidence and stating conclusions, however, is not the same thing as analysis. This case is similar to *C.L. v. New York City Dep't of Educ.,* No. 12 Civ. 1676(JSR), 2013 WL 93361 (S.D.N.Y. Jan. 3, 2013), *aff'd*, 552 Fed. Appx. 81 (2d Cir. 2014), which rejected an administrative decision that "did not grapple with contrary evidence and gave no explanation for why it credited the unfounded assertions of a school psychologist who had observed [the student] for only an hour and a quarter over the cogent testimony of multiple highly credentialed teachers who had worked closely with [him] for a full school year." *Id.* at *7. *See also, e.g., G.B. v. Tuxedo Union Sch. Dist.,* 751 F. Supp.2d 552, 578-79 (S.D.N.Y. 2010), *aff'd*, 486 Fed. Appx. 954 (2d Cir. 2012).

Next, the District Court referred to evidence that Niantic Center has a well-qualified special education teacher and would have better teachers for John in future years than SSA. A117. These statements, which do not appear in the IEP, constitute impermissible retrospective evidence. *C.F.,* 746 F.3d at 80. The District Court's statement that the IEP comported with Dr. Kemper's recommendations is not correct. (See discussion *supra*.)

The District Court accorded too much deference to the IHO's flawed opinion. For all of the foregoing reasons, this Court should reverse the District Court's ruling insofar as it concluded that the 2009-2010 IEP offered John FAPE.

### B. The Court Erred in Finding John's Unilateral Placement Inappropriate.

The District Court also erred in upholding the IHO's conclusion that John's placement (SSA plus specialized services) was inappropriate. In assessing appropriateness of a unilateral placement, this Court has emphasized the importance of "such objective evidence of progress as grades and test results." *Mrs. B.*, 103 F.3d at 1121 (2d Cir. 1997); *see also, e.g., Frank G.*, 459 F.3d at 364; *Walczak*, 142 F.3d at 130. "No one factor is necessarily dispositive"; the court must "consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs." *Frank G.*, 459 F.3d at 364.

In order to merit reimbursement under the IDEA, a parent's choice of program need not meet the same standards to which a district's program is held. *Florence County*, 510 U.S.. at 14. Thus, "a private placement need not provide certified special education teachers or an IEP," *Frank G.*, 459 F.3d at 364, nor must it "furnish[] every service necessary to maximize [the] child's potential." *Id.* at 365. The parent need only show that the placement provided "some element of

special education services in which the public school placement was deficient." *Id.* at 365.

In this case, plentiful, unrebutted, objective evidence showed that John's program of SSA plus specialized services met his needs and enabled him to make academic progress. Dr. Kemper's testimony, affidavit, and 2009, 2010, and 2011 re-evaluations show, through objective results of standardized tests, that John made significant progress in his areas of need, including oral language, reading, and spelling, as a result of that program. SA134-37, 359-66, 465-84. Ms. Campbell's testimony, report, and affidavit provide objective evidence as to John's progress in reading. SA226-29, 450-53. Ms. Theadore's reports and affidavit provide objective evidence as to John's progress in oral and written language. SA252-54, 506-12, 542-46, 520-41. John's SSA progress reports and Ms. Rosenberg's testimony provide objective evidence that he achieved good grades at SSA and advanced from grade to grade. *See* SA233-35, 370-74. John's grades, test scores, and regular advancement comprise exactly the type of objective evidence that the Second Circuit has characterized as probative. *See, e.g., Frank G.*, 459 F.3d at 365; *Mrs. B.*, 103 F.3d at 1120-21. Where, as here, the student's "objective academic achievements are uncontradicted and certainly not 'trivial,'" they prove the appropriateness of his program. *Walczak*, 142 F.3d at 131. Here, as in *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837 (2d Cir. 2014), the

55

administrative decision failed to give due weight take into consideration the evidence of the student's progress. The district judge failed even to allude to such evidence (including the additional evidence submitted to the court).

The evidence of John's social and emotional progress, too, is plentiful and uncontested. Dr. Kemper and Ms. Campbell testified to their observations of John at SSA. Dr. Kemper described how SSA allowed John to perform academically and to engage in social communication with peers. SA142-44. Ms. Campbell explained how the atmosphere and approach at SSA dovetailed with her Orton-Gillingham instruction. SA76-77. Ms. Rosenberg described the ways in which SSA helped John learn to interact with peers, develop executive functioning skills, and address his anxiety. *See* SA233-35. Ms. Doe provided similar evidence. Dr. Anthony Bram, a clinical psychologist who evaluated John in June 2011,[23] found that John had made significant progress, increasing his self-esteem, improving social pragmatics, and developing trust. SA206-207.

The IHO's conclusion that Ms. Doe's was inappropriate, is unsupported by the record. The IHO erred, first, in focusing only on SSA in her discussion of the

---

[23]  Subsequent progress is relevant to show the appropriateness of the unilateral placement. *Town of Burlington v. Department of Educ. of Massachusetts*, 736 F.2d 773, 791 (1st Cir. 1984) ("in many instances experts who have testified at the administrative hearing will be bringing the court up to date on the child's progress from the time of the hearing"), *aff'd on other grounds*, 471 U.S. 359 (1985).

unilateral placement, when in fact the program that Ms. Doe provided must been seen as a whole, consisting of SSA *plus* specialized services. The IHO apparently disregarded the latter altogether, stating that Ms. Doe "is requesting reimbursement for . . . services privately obtained. No evidence was presented during the hearing on this issue nor was this issue pursued." This statement is unfounded. As noted above, Ms. Doe in fact presented extensive evidence about the services she obtained for John.

The IHO faulted SSA because, she stated, it "provides no special education services whatsoever, does not implement the IEP, and the teachers are not special education certified." The District Court, in upholding the decision, relied on this observation. A122. As discussed above, however, it is well established that a unilateral placement need not provide special education services, need not employ certified special education teachers, and need not implement an IEP, as long as it meets the child's special needs in some way that the proposed public school placement did not. SSA met John's special needs in a number of ways, which the IHO and the District Court ignored. Here, as in *Frank G.*, "[t]he small class size offered at [the unilateral placement] was one element of the special education services necessary to address a significant deficiency in the inappropriate

placement the school district offered." 459 F.3d at 365.[24] Moreover, as in *Frank G.*, the private placement provided numerous accommodations and modifications to meet the student's needs. SSA shortened John's writing assignments, modified grading criteria for tests, employed strategies to address his anxiety and communication needs, and developed a written plan to address his executive functioning deficits. Staff monitored his social exchanges and taught him how to interact with peers. John received 1:1 advanced math instruction; thus it is incorrect to state, as the court did, that SSA "could not provide [him] with advanced instruction in the areas in which he excelled." A122[25]; SA 522. SSA, like the program in *Frank G.*, was appropriate not only because of small class size, but because it included numerous elements specially designed to meet the student's needs. *See Frank G.*, 459 F.3d at 366-67; *G,B.*, 751 F. Supp.2d at 583-86; *Knable v. Bexley*, 238 F.3d 755, 770 (6th Cir. 2001) (cited with approval in *Frank G.*); *Briere v. Fair Haven Grade Sch. Dist.*, 948 F. Supp. 1242, 1257 (D. Vt. 1996).

The IHO and court also cited the fact that John had to leave SSA on some days to receive specialized services. The evidence showed, however, that John is a complicated child and that it is difficult if not impossible to find a program that can

---

[24] Even the IHO acknowledged that John benefits from SSA's small classes. A60.

[25] "Advanced instruction" is a red herring in any event. Giftedness is not a disability, and an IEP is not required to address needs related to a child's high IQ.

address all of his needs under one roof. *See, e.g.,* SA 147. The fact that he needed to leave SSA two afternoons per week does not make SSA inappropriate, as the IHO thought.[26]  *See R.K. v. New York City Dep't of Educ.*, No.09-CV-4478 (KAM), 2011 U.S. Dist. LEXIS 32248, 2011 WL 1131492 (E.D.N.Y. Jan. 21, 2011), *adopted,* 2011 U.S. Dist. LEXIS 32235 (E.D.N.Y. Mar. 28, 2011), *aff'd sub nom. R.E. v. New York City Dep't of Educ.,* 694 F.3d 167 (2d Cir. 2012).  Rather, in devising a program consisting of SSA plus specialized services, Ms. Doe arrived at a creative, flexible, and appropriate way of meeting John's unique needs, when the Board failed to do so.

Here, as in *C.L. v. Scarsdale*, 744 F.3d at 839-40, the administrative decision failed to take into consideration evidence of the student's progress.  The district judge, too, failed to allude to such evidence (including additional evidence submitted to the court).  Both the IHO and the court fastened on one instance of regression mentioned in Dr. Kemper's May 2009 evaluation, when John had not made expected progress in spontaneous written expression.  This one instance of regression is far outweighed by the evidence of John's progress in all other areas.  Moreover, the lowered score led Dr. Kemper to recommend additional services (SA 367) which in turn led to renewed progress.  SA301-SA302.

---

[26] Ms. Rosenberg and Ms. Doe testified that John made up much of the work he missed in any event, either at SSA or at home. *See, e.g.,* SA 552.

For all of the foregoing reasons, the District Court erred in concluding that John's unilateral placement for 2009-2010 and 2010-2011 did not meet his needs. This Court should reverse the District Court's ruling insofar as it so held.

## III.  THE DISTRICT COURT ERRED IN DENYING REIMBURSEMENT FOR JOHN'S 2010-2011 UNILATERAL PLACEMENT.

### A.  The District Court Correctly Held That the Board's Failure to Develop an IEP for John for 2010-2011 Violated His Right to FAPE.

The evidence at hearing clearly established, and the IHO found, that "[t]he Board has not conducted an annual review, proposed a program, or held a PPT for the 2010-2011 school year." A54. The Board failed to propose an IEP for John for 2010-2011 or for the summer of 2010; thus, he had been without an IEP for approximately seven months as of the date of the IHO's decision.  Inexplicably, the IHO failed to conclude that this fundamental violation of John's rights deprived him of FAPE.  Instead, she stated that "[t]o the extent any procedural violations occurred, such violations were not sufficiently significant to render invalid a proposed IEP, nor did any procedural violation result in a denial of FAPE to the Student." A62. The IHO ordered the Board to convene a PPT meeting within 15 days of her decision "to conduct an annual review, and [to] review possible alternative placements for the Student." *Id.* She failed to order any other relief for the Board's 2010-2011 violations of John's procedural and substantive rights.

60

As the Supreme Court has stated, the "core of [IDEA] . . . is the cooperative process that it establishes between parents and schools," and the "central vehicle for this collaboration is the IEP process." *Shaffer v. Weast*, 546 U.S. 49, 53 (2005). Here, the Board failed to re-evaluate John, in violation of 20 U.S.C. § 1414(a)(2), 34 C.F.R. § 300.303, and Conn. Agencies Regs. § 10-76d-9. It failed to convene a PPT to review and revise his IEP, in violation of 20 U.S.C. § 1414(d)(4)(A)(i)-(ii), 34 C.F.R. § 300.324(b), and Conn. Agencies Regs. § 10-76d-11(b). The Board failed to afford Ms. Doe her rights to be present and participate in meetings to develop John's IEP and determine his placement, in violation of 20 U.S.C. §§ 1414(d)(1)(B)(i), (e), 34 C.F.R. §§ 300.321(a)(1), 300.322, 300.501(b), (c), and Conn. Agencies Regs. § 10-76d-12(c). The Board failed to have an IEP in effect for John as of the start of 2010-2011, in violation of 20 U.S.C. § 1414(d)(2)(A), 34 C.F.R. § 300.323(a), and Conn. Agencies Regs. § 10-76d-11(a).

These types of violations "go to the heart of parental participation," and are so serious as to "constitute a denial of a free appropriate public education per se." *Briere*, 948 F. Supp. at 1255. *See also Davis v. Wappingers Cent. Sch. Dist.*, 431 Fed. Appx. 12, 15 (2d Cir. 2011); *Knable*, 238 F.3d at 768 (requirement of a written IEP should "be enforced rigorously"); *Union Sch. Dist. v. Smith*, 15 F.3d

1519, 1525-26 (9th Cir. 1994).[27]  As the Supreme Court has stated, "when a child requires special-education services, a school district's failure to propose an IEP of any kind is at least as serious a violation of its responsibilities under IDEA as a failure to provide an adequate IEP."  *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2491 (2009).  Clearly, the Board's multiple violations of John's and Ms. Doe's rights "impeded [John's] right to a [FAPE]," "significantly impeded [Ms. Doe's] opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to [John]," and "caused a deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(2).

The District Court properly rejected the Board's assertion that it was not responsible for John's education because he was attending school at SSA in New London.[28]  John was a unilaterally placed private student where FAPE is at issue,

_____

[27] Even if the Board thought that Ms. Doe would reject anything it offered, it was still required to comply with IDEA's procedures and make a formal written offer of placement.  *Knable*, 238 F.3d at 768; *Union Sch. Dist.*, 15 F.3d at 1525-26.

[28]  Even assuming *arguendo* that the Board truly believed it was not responsible for John, the district's subjective intent is "not material," where the 2010-2011 school year "began without an IEP in place or ready to be in place and as a result he was denied the free appropriate public education to which he was entitled."  *Gerstmyer v. Howard County Pub. Sch.*, 850 F. Supp. 361, 366 (D. Md. 1994).

Moreover, as the magistrate judge noted, the Board raised this argument on a motion to dismiss the hearing request, which the IHO denied. In her decision following the hearing, the IHO implicitly found the Board responsible for John when she ordered it to convene a PPT for him. The Board did not appealed either the denial of the motion to dismiss or the order to convene the PPT.  Thus, the

pursuant to 20 U.S.C. § 1412(a)(10)(C), not a parentally-placed private student

pursuant to 20 U.S.C. § 1412(a)(10)(A); thus, East Lyme as his district of

residence remains responsible for him. *See, e.g., James v. Upper Arlington City*

*Sch. Dist.*, 228 F.3d 764, 768 (6th Cir. 2000); *Moorestown Twp. Bd. of Educ. v.*

*S.D.*, 811 F. Supp. 2d 1057, 1067-77 (D.N.J. Sept. 15, 2011); *District of Columbia*

*v. West*, 699 F. Supp. 2d 273, 280 (D.D.C. 2010); *Regional Sch. Dist. No. 9 Bd. of*

*Educ. v. Mr. and Mrs. M.*, No. 07-01484, 2009 U.S. Dist. LEXIS 71032 at * 29 (D.

Conn. Aug. 7, 2009); *Ms. K. v. Maine Sch. Admin. Dist. No. 40*, No. 06-42-P-H,

2006 U.S. Dist. LEXIS 78705 (D. Me. Oct. 26, 2006); *District of Columbia v.*

*Abramson*, 493 F. Supp. 2d 80 (D.D.C. 2007); Conn. Gen. Stat. § 10-76d(a)(1);

Assistance to States for the Educ. of Children with Disabilities & Presch. Grants

for Children with Disabilities, 71 Fed. Reg. 46540-41, 46593 (Aug. 14, 2006).

     The District Court properly distinguished the case on which the Board relies,

*L.G. v. Wissahickon Sch. Dist.*, Civil Nos. 06-0333, 06-3816, 2011 WL 13572

(E.D. Pa. Jan. 4, 2011). See A119-120. The discussion in that case is brief, and its

reading of 20 U.S.C. § 1412(a)(10)(C)(i) is confused. That statute provides that a

district need not pay for the cost of educating a child at a private school "*if [the*

*district] made a [FAPE] available to the child* and the parents elected to place the

child" privately. 20 U.S.C. § 1412(a)(10)(C)(i) (emphasis supplied). The statute

---

Board's argument on this issue was not properly before the District Court.

refers to payment; it says nothing about the district's obligation to continue to conduct annual reviews, develop IEPs, and propose placements. Moreover, the logic is circular: how can one determine whether the district "made [FAPE] available to the child" in any given year, unless the district develops an IEP and proposes a program? As the courts intimated in cases such as *Moorestown* and *Ms. K.*, adoption of the approach displayed in *Wissahickon* would lead to the worst kinds of results: districts would have an incentive to propose inadequate IEPs, inducing parents to withdraw their children from public schools and thereby allowing the district to wash its hands of those students. Congress did not intend, nor should the Court permit, turning the IDEA into a "game of poker," *Moorestown*, 811 F. Supp. at 1070-71, or using IDEA as a "trap door" to jettison special needs students in this fashion. *Ms. K.*, 2006 U.S. Dist. LEXIS 78705 at *49 n.5.

For all of these reasons, this Court should uphold the District Court's determination that the Board violated John's rights to FAPE by failing to develop a 2010-2011 IEP for him.

### B. The District Court Erred in Failing to Order Any Relief for the Board's Deprivation of John's Right to FAPE in 2010-2011.

In instituting the statutory scheme now known as IDEA, Congress did not intend to "create a right without a remedy." *Burr*, 863 F.2d at 1078. Reimbursement is an equitable remedy, which gives a court "broad discretion" to

fashion relief. *Burlington*, 471 U.S. at 369. Where, as in this case, the district "abrogated its obligation to provide an appropriate educational program," that fact weighs heavily in favor of reimbursement. *Susquenita Sch. Dist. v. Raelee S.*, 25 IDELR 120, 126-27 (M.D. Pa.), *aff'd*, 96 F.3d 78 (3d Cir. 1996). Any other result would constitute an "empty victory" for Ms. Doe. *Alamo Heights Independent Sch. Dist. v. State Bd. of Education*, 790 F.2d 1153, 1161 (5th Cir. 1986) (quoting *Burlington*, 471 U.S. at 370).[29]

For the reasons discussed *supra* at 54-59, the District Court should have found John's unilateral placement appropriate to meet his needs. Thus, the remedy for the Board's 2010-2011 FAPE violation should be an order requiring reimbursement of all expenses connected with that placement for 2010-2011. In the alternative, as a matter of equity, the District Court should at least have ordered some sort of partial reimbursement to compensate John for the months that he spent without an IEP. *See M.H.*, 685 F.3d at 254 n.12.

## CONCLUSION

For all of the foregoing reasons, this Court should affirm the District Court's decision insofar as it held that the Does are entitled to reimbursement for the

---

[29] The IHO failed even to consider an award of compensatory education, stating that Ms. Doe had not sufficiently identified any compensatory services. Compensatory education is an available remedy for violations of IDEA. *E.g., P. v. Newington*, 546 F.3d at 123.

Board's violation of John's "stay-put" rights, that those rights were triggered in June 2009, and that the Board violated its FAPE obligation by failing to propose an IEP for John for 2010-2011. This Court should also reject the Board's allegations of error that would have the effect of reducing the judgment. This Court should reverse the District Court's decision insofar as it found no deprivation of FAPE for 2009-2010, found John's unilateral placement inappropriate for him, and awarded the Does no reimbursement in connection with that placement for 2009-2010 or 2010-2011. This Court should also reverse the District Court's decision insofar as it excludes summer services from the judgment and insofar as it fails to order stay-put reimbursement in the full value of the services of which the Board deprived John.

Respectfully submitted,

JOHN DOE and JANE DOE

By their attorneys,

/s/ *Eileen M. Hagerty*
Eileen M. Hagerty
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, MA 02114
Tel.: (617) 227-7031
Fax: (617) 367-2988
Dated: October 28, 2014        Email: ehagerty@kcslegal.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate

Procedure, the foregoing brief is in 14-Point Times Roman proportional font

and contains 15,655 words and thus is in compliance with the type-volume

limitation set forth in Rule 28.1(e)(2) of the Federal Rules of Appellate

Procedure.

Dated October 28, 2014

<u>/s/ *Eileen M. Hagerty*</u>
Eileen M. Hagerty